JAMES L. SEACORD vs. ELIZABETH PARKER SEACORD.

(*July 7, 1927.*)

RICE, J., sitting.

*Earle D. Willey* for plaintiff.

Superior Court for Kent County, No. 17, February Term, 1927.

On November 5, 1926, James L. Seacord filed a petition praying for an annulment of his marriage to the respondent, alleging that at the time such marriage contract was entered into the said Elizabeth Parker Seacord had a husband living from whom she had not been divorced. It appeared from the evidence that the marriage ceremony between the petitioner and the respondent was performed on the 6th day of July, A. D. 1925, and that the petitioner did not then know that the respondent had a husband from whom she had not been divorced; the respondent subsequently left the home of the petitioner on about the 19th day of January, A. D. 1926, and remained away from home until some

time in the month of December, at which time she returned and resided with him until some time in the month of January, 1927; that, while the petitioner then knew that the respondent at the time of their marriage had and still had a husband from whom she had not been divorced, he admitted that they had cohabited during that period as man and wife.

The question before the court was whether the act of the petitioner in so cohabiting with the respondent prevented an annulment decree as prayed for.

The petitioner's brief was as follows:

This court, at the suit of either party, may annul a marriage contracted while either of such parties had a husband or wife living. *Section* 3004, *Rev. Code* 1915.

Differing from cases of adultery where the offense has been condoned, and the petition must, therefore, be dismissed; the statute imposes no conditions on this authority. *Section* 3008, *Rev. Code* 1915; *Section* 3016, *Rev. Code* 1915, as amended by *chapter* 217, 28 *Laws of Delaware*.

*Section* 4785, *Rev. Code* 1915, also, makes bigamy a criminal offense, punishable by fine and imprisonment. In other words, the marriage of a person who has, at the time, a husband or wife living, is unlawful by statute.

Such a marriage was also absolutely void at common law. Schouler on *Mar., Div., Sep. and Domestic Relations* (6th Ed.), *vol.* 2, *p.* 1386.

The petitioner in this case is the innocent party, as he did not know until after his marriage to the respondent that she had not been divorced from her former husband.

An action for divorce is predicated on a valid marriage, but a petition for annulment always presupposes that the marriage was either void, or voidable. *Millar v. Millar* (1917), 175 *Cal.* 797, 167 *P.* 394, *L. R. A.* 1918B, 415, *Ann. Cas.* 1918E, 184.

The doctrine of condonation can have no application to this case, as forgiveness cannot validate an illegal marriage. *Millar v. Millar*, 175 *Cal.* 797, 167 *P.* 394, *L. R. A.* 1918B, 415, *Ann. Cas.* 1918E, 184.

Nor does the rule of *pari delicto* or the equitable maxim, "He who comes into court must come with clean hands," apply in annulment cases. This is because public policy is involved. With respect to this principle, Schouler on *Marriage, Divorce, Separation, and Domestic Relations* (6th Ed.), 1420, says:

"There can be no estoppel where the marriage is absolutely void and the rule of *pari delicto* will not be applied to prevent relief in a suit to annul and set aside a void marriage, as that is a matter in which the state is an interested party. There is a growing feeling that the doctrine of *pari delicto* should not be applied to actions for nullity of marriage on the ground that the state is interested in the question, that the decree of annulment would establish the status of the parties beyond any doubt, and, also, the status of any future wife and children in case the defendant should remarry. So a marriage may be annulled under this doctrine even though both parties knew at the time it was contracted that one of them had a spouse living or that the marriage was otherwise defective."

On page 1163, the same author also says:

"The petition for annulment will not be barred by the fault of the plaintiff as the state is interested."

See, also, *Lynch v. Lynch*, 34 *R. I.* 261, 83 *A.* 83; *Davis v. Green* (1919), 91 *N. J. Eq.* 17, 108 *A.* 772; *Snell v. Snell*, 191 *Ill. App.* 239; *Szlauzis v. Szlauzis*, 255 *Ill.* 314, 99 *N. E.* 640, *L. R. A.* 1916C, 741, *Ann. Cas.* 1913D, 454; *Arado v. Arado*, 281 *Ill.* 123, 117 *N. E.* 816, 4 *A. L. R.* 28; *Heflinger v. Heflinger*, 136 *Va.* 289, 118 *S. E.* 316, 32 *A. L. R.* 1088; *Whippen v. Whippen*, 171 *Mass.* 560, 51 *N. E.* 174; *Huard v. McTeigh or Huard*, 113 *Or.* 279, 232 *P.* 658, 39 *A. L. R.* 528; *Tiedemann v. Tiedemann*, 94 *Misc. Rep.* 449, 157 *N. Y. S.* 1101; *Earle v. Earle*, 141 *App. Div.* 611, 126 *N. Y. S.* 317; *Wiley v. Wiley*, 75 *Ind. App.* 456, 123 *N. E.* 252.

In *Lynch v. Lynch, supra*, the court said:

"Her (referring to the petitioner) legal status, however, is something in which the state as well as the parties, is interested. If, as a matter of fact, she was already married when she undertook to enter into the marriage state with the respondent, such second marriage was a nullity and the court should so declare. The judge of the superior court found such to be the fact and declined to give decision for the petitioner solely upon the ground that she was in *pari delicto* with the respondent. In this case the court erred."

In *Davis v. Green, supra*, the court said:

"The equitable maxim that he who comes into equity must come with clean hands is subject to well-defined limitations. While the general rule is

that where the parties are in *pari delicto*, no affirmative relief of any kind will be given to one against the other, that rule has always been regarded by courts of equity as without controlling force in all cases in which public policy is considered as advanced by allowing either party to sue for relief against the transaction. *2 Pom. Eq. Jur.* § 941. That vital public interests are involved in a case of this nature is obvious. The marriage here under consideration is absolutely void without the aid of any judicial decree to that effect; the decree here sought is merely operative to establish for all time the status of the parties, whereas, without such decree lapse of time will render it more difficult if not impossible, for their status to be ascertained by reason of the loss of evidence. It is in that office of the decree that vital public interests arise, since the remarriage of petitioner after the decease of her present husband or the remarriage of defendant may, in the absence of a decree at this time, expose to doubt the validity of lawful marriages and the legitimacy of lawful children.

\* \* \*

"In the English ecclesiastical courts, in suits for decrees of nullity of marriages which the statute declared absolutely void, it appears to have been uniformly recognized that the efficacy and importance of a judicial declaration of nullity was to prevent the consequences which might in future take place from death of witnesses or other occurrences rendering proofs difficult or uncertain (*Shelford on Marriage and Divorce, page* 565, title, 'Nullity'), and an examination of the reported cases will disclose that the fundamental reason for awarding decrees of nullity in those courts at the instance of either party was the protection of those public interests, and not because of any inability or hesitancy on the part of those courts to recognize and apply the equitable maxim already referred to in all appropriate cases."

In fact, there is authority to sustain the proposition that the maxim of "clean hands" does not apply in actions at law. 4 *A. L. R.* 45.

RICE, J., directed the entry of a decree annulling the marriage basing such decree on public policy.