In re HEALTHSOUTH CORP.
SHAREHOLDERS
LITIGATION.

Civ. A. No. 19896.

Court of Chancery of Delaware,
New Castle County.

Submitted: Nov. 20, 2003.
Decided: Nov. 24, 2003.

Ronald A. Brown, Jr., Prickett Jones & Elliott, P.A., Wilmington, DE; Frank P. DiPrima, Convent Station, NJ, for Plaintiffs.

William D. Johnston, Sara Beth A. Reyburn, and Dawn M. Jones, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; Thomas J. Hall, Thomas V. Sjoblom, Scott S. Balber, and Jeffrey I. Wasserman, Chadbourne & Parke, LLP, New York City, for Defendant Richard M. Scrushy.

Steven J. Rothschild, Edward P. Welch, Stephen D. Dargitz, and T. Victor Clark, Skadden Arps Slate Meagher & Flom, LLP, Wilmington, DE, for HealthSouth Corporation.

Stephen C. Norman, Richard L. Horwitz, and Richard L. Renck, Potter Anderson & Corroon, LLP, Wilmington, DE, for Individual Defendants.

Andre G. Bouchard, Bouchard Margules & Friedlander, P.A., Wilmington, DE, for the Special Litigation Committee of the Board of Directors of HealthSouth Corporation.

## OPINION

STRINE, Vice Chancellor.

In this opinion, I address a motion for summary judgment in this derivative action filed by stockholders of HealthSouth, Inc. The plaintiffs' motion seeks relief for a transaction in which defendant Richard M. Scrushy, HealthSouth's former Chairman and Chief Executive Officer, extinguished a loan of over $25 million that he owed to the company. In that transaction, Scrushy gave the company shares valued in the stock market at the dollar amount of the principal balance then needed to pay off the loan in full. The premise of the transaction, suggested, understood and communicated by Scrushy, was that the stock market price was a reliable indicator of the value of his stock, having been set in large measure in reliance upon the company's certified financial statements and other public releases regarding its financial health and prospects. As CEO of HealthSouth, Scrushy was charged with the responsibility of ensuring the proper preparation of these documents by his management team.

Shortly after he transferred some of his shares to HealthSouth in order to retire his debt, the first public revelations of financial problems at HealthSouth were revealed. Those and later revelations indicated that the financial information upon which the market was relying when HealthSouth accepted Scrushy's shares to retire his debt was materially misleading. On this record, that fact is undisputed and the extent of the material problems in HealthSouth's financial statements exceeds $2 billion. The result of the discovery of these problems was and remains a sharp decline in the price of HealthSouth's stock from the level used by the company in retiring Scrushy's debt.

Because Scrushy represented to HealthSouth that the market price was a reliable way to price his shares fairly, he was necessarily also representing that the company's financial releases were materially accurate. That representation was false, regardless of whether Scrushy knew it was. As a result of that inaccurate representation, HealthSouth received shares worth less than the value of the loan Scrushy was retiring.

For purposes of pressing this motion, the plaintiffs have accepted the notion that Scrushy, although responsible for ensuring the preparation of accurate financial information, was not aware that the company's financial statements and public releases were materially inaccurate. They have proceeded on this basis (although they believe that Scrushy was aware) because they contend that his actual knowledge of the material inaccuracy of these documents is irrelevant to their claims of unjust enrichment and equitable fraud, neither of which require that Scrushy have possessed an illicit state of mind.

I agree.

On the basis of undisputed facts, I find in this opinion that Scrushy is liable to HealthSouth under theories of unjust enrichment and equitable fraud, as neither theory is dependent on Scrushy's actual knowledge of the inaccuracy of HealthSouth's financial information. The HealthSouth board was entitled to and did rely upon Scrushy's assurance of the fairness of the market price as a transactional pricing mechanism. After all, as the company's CEO, he was in a better position than the rest of the board to assess the reliability of the company's financial statements and press releases, given that it was his job to assure that management prepared those documents with care and accuracy. To its detriment and Scrushy's unjust benefit, HealthSouth took back shares worth far less than Scrushy represented they were worth. To remedy the injury to HealthSouth, rescission is a fitting and practica-

ble remedy, coupled with pre-judgment interest.

## I. *Factual Background*

In May 1999, HealthSouth's shareholders approved an Executive Equity Loan Plan (the "Loan Plan" or "Plan"), Under that Plan, HealthSouth could make loans to executive officers in order to help them purchase HealthSouth common stock. Later that year, Scrushy, who was then HealthSouth's Chairman and CEO, borrowed $25,218,114.87 under the Plan (the "Loan"). With the Loan proceeds, Scrushy bought 4,362,297 shares of HealthSouth stock at approximately $5.78 per share.

At the end of June 2002, Scrushy informed HealthSouth that he was willing to repay the Loan in advance of its maturity date. The reasons for this are unclear and not material to the disposition of this motion.[1] Scrushy wanted to repay the Loan with HealthSouth stock.

The Compensation Committee of HealthSouth's board of directors met twice to consider that issue. At its second meeting, the Compensation Committee approved a transaction whereby it would take back shares of HealthSouth stock from Scrushy in order to cancel the principal balance of the loan. The Compensation Committee agreed that it would value Scrushy's stock based on the average between the high and low trading prices for HealthSouth stock on July 31, 2002. On August 1, 2002, Scrushy transferred sufficient shares, valued at the average July 31, 2002 trading price of $10.06 per share, to satisfy the principal balance of the Loan.

HealthSouth then cancelled the Loan. Hereafter, I refer to this transaction as the "Buyback."

Less than a month after the Buyback, HealthSouth issued a press release containing several important pieces of information. First, the press release announced a proposal whereby HealthSouth would spin off its surgery centers into a separate business. Second, the press release announced that Scrushy would step down as HealthSouth's CEO, turning that position over to the company's President and Chief Operating Officer, William T. Owens. Scrushy was to remain as Chairman of both HealthSouth and the spun-off surgery centers business. Finally, and most relevantly, the press release announced that HealthSouth was reducing its projected earnings before interest, taxes, depreciation and amortization by approximately $175 million annually from what had previously been publicly announced. As important, HealthSouth indicated that its "initial assessment" of projected EBITDA might prove "incorrect" and the company was therefore "discontinuing earnings guidance for the remainder of 2002 and 2003."[2]

HealthSouth attributed this sharp deviation from its previous guidance to changes in the policy of the Centers for Medicare and Medicaid Services ("CMS") regarding reimbursement for outpatient therapy services (the "CMS Reimbursement Policy"). In the press release, HealthSouth contended that it had sought guidance regarding the effect of this Policy in July and August and received confusing feedback, but de-

---

**1.** By this time, the Sarbances–Oxley Act prohibited loans to corporate executives on a prospective basis, providing one plausibly legitimate reason for the transaction. *See also* *infra* note 27 (discussing purported business rationales for repayment of the Loan with HealthSouth stock). The plaintiffs, more cynically, might infer that Scrushy wished to

eliminate his obligation to repay the Loan in cash using overvalued stock before evidence of material misstatements in HealthSouth's financial filings became public.

**2.** Certificate of Ronald A. Brown, Jr. ("Brown Aff.") Ex. N (HealthSouth Form 8–K, containing Press Release, dated Aug. 27, 2002).

cided to implement new practices reflecting a conservative interpretation of the CMS Reimbursement Policy. Scrushy provided an extensive quote in the press release, in which he attributed the spin-off of the surgery business in part to the CMS Reimbursement Policy, arguing that the surgery centers business would be valued more highly if it were separated from those aspects of HealthSouth affected by the CMS Reimbursement Policy. As of the date of this press release, HealthSouth had not made any prior public disclosure of the possible effect of the CMS Reimbursement Policy, which was announced in a directive on May 17, 2002 – over two months before the Buyback.

As a result of the press release in August 2002, the price of HealthSouth shares fell dramatically. But even worse news was yet to come.

As 2002 proceeded, HealthSouth backtracked on the proposed spin-off of the surgery centers. Scrushy also returned to his post as CEO. Then, on March 3, 2003, HealthSouth announced financial results for the first quarter of 2003 and the year ending December 31, 2002. Scrushy was quoted in the announcement, which included material adjustments to HealthSouth's financial statements, such as:

- A write-down of $445 million in the fourth quarter of HealthSouth's 2002 fiscal year, which ended December 31, 2002;
- "Other unusual charges" of $194.8 million, $175.8 million of which were cash charges and $65.8 million of which related primarily to fiscal years 2001 and earlier.[3]

The release makes clear that a good deal of the other cash charges related to periods before the Buyback, because they,

among other things, reflected adjustments to the accounting treatment of older accounts receivable.

In the press release, Scrushy is quoted as predicting that HealthSouth had hit "a bottom from which" it expected to "see growth in 2003."[4] Unlike Nostrodamus, Scrushy did not have to wait long to have his prediction proven wrong.

Soon after the March 3, 2003 announcement, the integrity of HealthSouth's financial statements became the subject of further publicity. On March 19, 2003, the Securities and Exchange Commission filed a complaint against HealthSouth and Scrushy alleging violations of the federal securities laws. That same day, the United States Attorney for the Northern District of Alabama announced that Weston Smith – Health South's former Chief Financial Officer who held that position during 2002 – had pled guilty to charges, including conspiring to falsify the financial statements of HealthSouth in a period beginning in 1997 and continuing to that time.

Scrushy was also placed on administrative leave that day.

A crisis then ensued at HealthSouth, as the price of its shares plummeted and the NYSE suspended their trading. On March 24, 2003, HealthSouth announced that it had retained Price Waterhouse-Coopers to conduct a forensic audit of its financial statements. In view of the various confidence-shaking events that had transpired, the company informed the public that its previous financial statements could no longer be relied upon.[5] The company further announced its retention of a turn-around specialist to help the company stabilize its affairs, which were in financial free-fall. On March 25, 2003, HealthSouth

---

**3.** Brown Aff. Ex. R (HealthSouth Press Release, dated Mar. 3, 2003), at 2–3.

**4.** *Id.* at 3.

**5.** Brown Aff. Ex. T (HealthSouth Form 8–K, dated Mar. 26, 2003).

announced that the NYSE had given a formal notice of its proposal to delist the company's shares.

Then, on March 31, 2003, Scrushy was formally fired as CEO. Independent board member Robert May replaced him as interim CEO. Scrushy insisted on remaining as a director of HealthSouth.

In April 2003, HealthSouth was unable to make interest payments to certain of its noteholders, thus falling into default on its obligations. Thereafter, HealthSouth ceased making interest and principal payments on its outstanding obligations. Throughout that period and continuing forward, the company has been attempting to stabilize its affairs and avoid bankruptcy.

To that end, in May 2003, HealthSouth engaged Price WaterhouseCoopers as its new accountants, replacing Ernst & Young. On July 7, 2003, the company announced a preliminary business plan update, which contained certain heavily caveated projections of the company's performance for the coming year. In that same announcement, the company reiterated the unreliability of its previous financial statements, noted that its former auditors Ernst & Young had withdrawn their audit reports on all previous filings, and indicated that it had not yet determined the "the extent of any required restatement of our prior financial reports." [6] The company did, however, provide this summary of the status of PwC's work:

|  | Estimated Restatement (Billions) | Status |
| --- | --- | --- |
| Fraudulent Entries (PwC) | $2.0 | • Substantially complete<br>• Field visits in process<br>• Certain documents outstanding |
| Acquisition Accounting (PwC) | Unknown | • No documents received to date<br>• Forensic work has not begun |
| Accounting Practices Review (Company) | $0.5 | • In process |

The estimated restatement represents the cumulative amounts of historical balance sheet misstatements identified to date. As process is completed, *additional amounts will be identified,* THE IMPACT OF WHICH MAY BE MATERIAL.[7]

As of this date of this opinion, fifteen HealthSouth executives have pled guilty to crimes centering on the intentional falsification of HealthSouth's financial statements. Among those pleading guilty were William T. Owens, Scrushy's top subordinate in 2002 and his successor as CEO

for a brief period; the previously mentioned Weston Smith, who was HealthSouth's CFO in 2002; and every HealthSouth CFO who had served under Scrushy during HealthSouth's time as a public company. Both the executives who pled guilty and the federal government have alleged that Scrushy was integral to the alleged conspiracy at HealthSouth and he remains the ultimate target of the federal government's investigative and prosecutorial efforts, having recently been indicted.

Remaining on the HealthSouth website to this date is the following disclaimer:

---

6. Brown Aff. Ex. Q (HealthSouth Form 8–K, containing Business Plan Update, dated July 7, 2003).

7. *Id.* (italicized emphasis added).

In light of recent investigations into HealthSouth's financial reporting and related activity, the financial statements currently found on this website should no longer be relied upon. Additional information will be provided as it becomes available.[8]

This statement is markedly less confidence-inspiring than were HealthSouth's financial statements as of the time of the Buyback. At that time, HealthSouth's full year results for FY 2001 showed revenues of $4.4 billion and net earnings of $202 million, or $0.52 per share.[9] For the first quarter of FY 2002, ending on March 31, 2002, HealthSouth reported revenues of $1.13 billion and earnings of $0.27 per share, an improvement of $0.08 per share over the comparable quarter in FY 2001. Put simply, the stable, profitable company portrayed by the financial statements that the market relied upon in material part to set the trading price of HealthSouth on July 31, 2002 was in fact quite different than the actual HealthSouth that existed as of that date.

As of the date of this opinion, HealthSouth has managed to avoid falling into bankruptcy and some measure of stability has been restored to the company's operations, after new management and outside advisors worked out arrangements with creditors and began servicing the company's debt. Although this has restored some value to HealthSouth's common stock, that stock continues to trade at prices well below the price accorded to Scrushy in the Buyback.

## II. The Plaintiffs' Motion For Summary Judgment

The plaintiffs move for summary judgment on two counts of their amended complaint. The factual premise of each count is similar: Scrushy, HealthSouth's Chairman, CEO, and director retired an outstanding debt to HealthSouth by tendering to it stock, which was valued on the basis of the prevailing market price on July 31, 2002. Fundamental to that Buyback transaction from HealthSouth's perspective was the reliability of the market price as an accurate and fair basis by which to value the shares Scrushy tendered in order to retire his debt to HealthSouth.

The plaintiffs now argue that the Buyback should be rescinded under two theories.[10] First, the plaintiffs contend that Scrushy was unjustly enriched by the Buyback because he was able to retire a debt on the cheap based on a market price set in reliance upon materially misleading financial statements that Scrushy himself had signed. Therefore, Scrushy should be required to make restitution. Second, the plaintiffs argue that Scrushy is liable to HealthSouth for making an innocent misrepresentation of fact. Having premised the Buyback on the notion that HealthSouth's market price was a fair proxy for value, Scrushy also impliedly represented that the financial statements that he had signed and that were influential to that market price were materially accurate. Because HealthSouth reasonably relied upon the market price and those financial statements in valuing the stock Scrushy provided the company in the Buyback, it is

8. Brown Aff. Ex. U.

9. Brown Aff. Ex. E (HealthSouth Proxy Statement filed on Sched. 14A, dated Apr. 12, 2002), at App. A–2.

10. The plaintiffs have been surgical in their approach. Because Scrushy faces criminal charges and has invoked his Fifth Amendment rights, the plaintiffs have not pressed other theories dependent on proof that Scrushy intentionally participated in a conspiracy to falsify HealthSouth's financial statements.

eligible to receive rescissory relief from Scrushy.

### III. *The Procedural Standard*

On this motion, the plaintiffs bear the burden to demonstrate that there is no genuine issue of material fact regarding the dispute and that they are entitled to judgment as a matter of law.[11] When, as here, the plaintiffs have supported their position on a question of fact with admissible evidence and pointed to the absence of proof bolstering the non-moving party's claims, Scrushy, as the non-moving party, must come forward with admissible evidence creating a triable issue of fact or suffer an adverse judgment.[12]

### IV. *Scrushy's Posture*

Scrushy faces criminal charges. For that and other tactical reasons, he has responded to the plaintiffs' motion for summary judgment without filing either a substantive affidavit or an affidavit seeking discovery under Rule 56(f). Rather, he has advanced several legal arguments and two major factual arguments in order to defeat the motion.

The first factual argument is that Scrushy is the innocent victim of a massive conspiracy to commit fraud executed by fifteen of his managerial subordinates without his participation or knowledge. This argument is unsupported by admissible evidence but it flavors his entire answering brief. Most of that document heaps blame on Scrushy's subordinates and on HealthSouth as an entity for its accounting problems. Scrushy's argument that he did not commit conscious wrongdoing in connection with HealthSouth's financial statements is not, for the most part, relevant to the pending motion because the plaintiffs have not premised their motion

on the proposition that Scrushy had actual knowledge of the falsity (or put less prejoratively, the material inaccuracy) of HealthSouth's financial statements as of the time of the Buyback.

The more relevant factual argument Scrushy makes is that the plaintiffs have not produced sufficient evidence to show that HealthSouth's financial statements were materially misleading as of the time of the Buyback. This argument is not based on Scrushy's submission of his own evidence showing that HealthSouth's financial statements were in fact materially accurate as of the Buyback. *He has produced no evidence of that kind.* Rather, the argument rests primarily on the notion that because PwC has not finished its work, any inference drawn from its work to date would be unreliable.

■ As a prelude to addressing the motion, I address this factual argument and find it lacking in merit. At the summary judgment stage, the evidence submitted by the plaintiffs is adequate to show that the financial statements and other public guidance of HealthSouth were materially misleading as of the date of the Buyback. This evidence includes:

- the press release Scrushy caused HealthSouth to issue in August 2002 indicating that HealthSouth's public earning projections as of the time of the Buyback were optimistic by over $175 million in EBITDA annually and that no reliable earnings guidance could be given;
- the company's own announcements indicating that the financial statements existing as of the Buyback cannot be relied upon;
- the PwC public estimate of restatements of over $2.5 billion with the

---

11. Ct. Ch. R. 56(c).

12. *Cochran v. Supinski,* 2002 WL 749165, at *3 n. 9 (Del.Ch. Apr. 23, 2002) (citing *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *aff'd,* 813 A.2d 1140 (Del.2002) (TABLE).

possibility of additional material restatements in excess of that number; and

- the March 3, 2003 press release put out under Scrushy's supervision reflecting material adjustments to HealthSouth's financials for periods pre-dating the Buyback and relevant to the July 31, 2002 trading price of HealthSouth's shares.

■ I need not consider, as the plaintiffs ask me to do, the guilty pleas of Scrushy's subordinates to reach the conclusion that HealthSouth's financial statements were materially deficient as of the Buyback. In the face of the extensive evidence I have cited – all of which would be admissible directly[13] or through witness testimony as to its substance[14] – Scrushy has stood mute. Nothing in his papers gives any hint that he actually believes that HealthSouth's financial statements were accurate as of that date. Indeed, to the contrary, Scrushy's brief suggests that he believes that HealthSouth's statements were not materially accurate. He just disclaims personal responsibility for their inaccuracy, attributing it to misconduct by his subordinates of which he was then unaware.

I therefore find that there is no material dispute of fact that HealthSouth's financial statements were materially misleading as of the date of the Buyback and decide the motion before me on that basis.

## V. The Plaintiffs Have Made Out The Elements Of Each Of Their Claims

### A. Unjust Enrichment

The Delaware Supreme Court recently defined unjust enrichment as

the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. To obtain restitution, the plaintiffs were required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit. Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer. Restitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, *even though he may have received those benefits honestly in the first instance,* and even though the plaintiff may have suffered no demonstrable losses.[15]

■ It seems obvious that the plaintiffs have proven that the Buyback unjustly enriched Scrushy. As CEO of HealthSouth, Scrushy was charged with managerial responsibility for overseeing the preparation of accurate and reliable financial statements. In the Buyback, HealthSouth relied upon the integrity of the market

---

**13.** As to all of this evidence, see D.R.E. 804(b)(3) (statement against interest admissible if declarant unavailable); as to the press releases Scrushy authorized as CEO, see D.R.E. 801(d)(2) (admissions by party-opponent not hearsay).

**14.** For example, PwC could obviously be called to testify that its publicly made statements on behalf of HealthSouth on July 7, 2003 accurately reflect its views. This would be admissible evidence. Given the circumstances in which it was released, the 8–K in which the statements about HealthSouth's ac-

counting were made seem a more-than-reliable basis upon which to conclude that the financial statements were materially deficient as of the Buyback. Put bluntly, the company's and PwC's public statements were filed with the SEC and could form the basis for securities law claims if they were false or misleading. There is no doubt that witnesses from the company and PwC would testify to these facts, if necessary.

**15.** *Schock v. Nash,* 732 A.2d 217, 232–233 (Del.1999) (internal quotation marks and footnotes omitted, emphasis added).

price for its stock in order to establish the value of Scrushy's shares fairly.

As between HealthSouth and its stockholders, on the one hand, and Scrushy, on the other, there is no question that Scrushy is the party with superior access to information and the primary duty to ensure the accuracy of the financial statements. As CEO of HealthSouth, Scrushy was the key executive at the company and was responsible to HealthSouth's board for the accurate preparation of financial statements. HealthSouth's board was entitled to rely upon Scrushy's reports and recommendations,[16] including his implicit representation – as a HealthSouth fiduciary – that HealthSouth's market price was a reliable indicator of the value of the shares he was transmitting to HealthSouth in the Buyback.

Through conscious wrongdoing, negligent oversight of his subordinates, or innocent failure to catch the misdeeds or inaccuracies of his underlings, Scrushy signed financial statements for HealthSouth that were materially inaccurate. These financial statements formed the most important information on which the market price of HealthSouth's stock was based on July 31, 2002. The market price was what was used to guarantee the fairness of the Buyback to HealthSouth. Whether or not Scrushy breached any cognizable duty in signing those statements, he was undoubtedly unjustly enriched when the company of which he was a fiduciary bought back shares from him at a price inflated by false financial statements he had signed. After all, it was his managerial responsibility to ensure the filing of accurate statements and he should not, as a fiduciary, benefit at the expense of the object of his trust when his efforts were insufficient.

### B. *Innocent Misrepresentation*

■■ To make out their claim of innocent misrepresentation, the plaintiffs must show: 1) a false statement by Scrushy; 2) made with the intent to induce HealthSouth to act; 3) upon which HealthSouth justifiably relied in acting; and 4) injury.[17] Equity "provide[s] a remedy for negligent or innocent misrepresentations: the defendant did not have to know or believe that his statement was false or to have proceeded in reckless disregard of the truth."[18]

■ On the undisputed facts, the plaintiffs have made the required showing.

First, Scrushy represented to HealthSouth that the market price was a reliable way to value his shares, thereby vouching again for the integrity of the financial statements he had signed (and earnings projections he had caused the company to make).

Second, this representation was false as the market price was not a reliable indicator of value because that price was materially distorted by HealthSouth's release of inaccurate information.

Third, Scrushy intended for HealthSouth to rely on the accuracy of the stock market price as a fair way to value his shares in the Buyback. In other words, he intended HealthSouth to conclude that the market price was reliable in large measure because the company's financial statements and press releases regarding its prospects were materially accurate and not misleading.

Fourth, HealthSouth's board could justifiably rely upon Scrushy's assurance that a market price set on the basis of financial statements and other information he

---

**16.** *See* 8 Del. C. § 141(e).

**17.** *See Zirn v. VLI Corp.*, 681 A.2d 1050, 1060–61 (Del.1996).

**18.** *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983).

signed or authorized for release as Health-South's CEO was a fair pricing mechanism.

Finally, the evidence is clear that a true picture of HealthSouth as of the date of the Buyback was far less appealing to the eye than the one permitted by its financial statements, leading Scrushy to receive unduly excessive value for his shares in the Buyback.

## VI.  *Scrushy's* In Pari Delicto *And Unclean Hands Defenses Are Meritless*

■ Scrushy's major argument to avoid summary judgment is that HealthSouth is equally culpable with him regarding the inaccuracy of its financial statements and that the legal doctrine of *in pari delicto*, and its equitable counterpart, the doctrine of unclean hands, respectively, bar the plaintiffs' unjust enrichment and innocent misrepresentation claims.  For rather obvious reasons, this argument lacks logical force.

The CEO of a major corporation like HealthSouth possesses an enormous amount of authority and therefore owes the corporation a corresponding degree of responsibility.  HealthSouth's board of directors was entitled to rely upon Scrushy and his management team, particularly in the preparation of the company's financial statements, an area in which management has traditionally been preeminent.  In the process of preparing and signing financial statements, Scrushy necessarily represented to the company's board, audit committee, outside auditors, and its public stockholders that the financial statements his management team had prepared were ma-

terially accurate in all respects.  As the auditor's report for HealthSouth's FY 2001 10–K stated: "These financial statements and schedule are the responsibility of the Company's management." [19]

Scrushy seeks to turn this relationship around and portray HealthSouth as an *entity* that is equally culpable with him for any falsity in the financial statements.  If Scrushy's subordinates were the cause of the falsity, says Scrushy, then HealthSouth as an entity is equally to blame with him for failing to catch this subordinate-level fraud.  This is transparently silly.

■ If Scrushy's subordinates blew one – or several seasons' full of pitches – past him, that still does not absolve him or render him on equal status with HealthSouth as an entity.  It was Scrushy's duty to ensure the filing of accurate financial statements.  Having failed to do so (for whatever reason) and having materially benefited from that failure in the Buyback, Scrushy cannot wield the doctrine of *in pari delicto* to escape liability.  It is because corporations must act through living fiduciaries such as Scrushy that the application of the *in pari delicto* doctrine has been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own conduct vis-a-vis their corporations.[20]  Stated simply, HealthSouth is not at "equal fault" with Scrushy for the material deficiencies in HealthSouth's financial statements because it was Scrushy who was the ultimate manager responsible for ensuring the integrity of those statements.[21]  The reality that HealthSouth itself might be liable to third-parties due to the failure of its managers (under

---

**19.**  Brown 2d Supp. Aff. Ex. 5 (HealthSouth Form 10–K, dated Mar. 27, 2002), at 38.

**20.**  *In re Walnut Leasing Co.*, 1999 WL 729267, at *5 (E.D.Pa. Sept. 8, 1999) ("Vis-a-vis their corporations, insiders cannot avoid the consequences of their own handiwork."); *In re Granite Partners, L.P.*, 194 B.R. 318, 332

(Bankr.S.D.N.Y.1996) ("*In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners.").

**21.**  *Cf. Tarasi v. Pittsburgh Nat'l Bank*, 555 F.2d 1152, 1156 (3d Cir.1977) ("*In pari delicto*, which literally means 'of equal fault,' is

Scrushy's supervision) to prepare materially accurate financial statements does not mean that HealthSouth has no right to seek recompense from those managers for the harm they caused it.[22] To hold otherwise would be to leave the constituencies of corporate entities – including public stockholders and creditors – with no recourse when their corporation is injured by its managers.[23] Like its equitable counterpart the unclean hands doctrine, the *in pari delicto* defense will not be applied when its acceptance would contravene an important public policy.[24]

Given this discussion, it is rather obvious that Scrushy's attempt to wield the unclean hands defense as a shield also cannot succeed. The reasons why this is so are several. But I will state only two. First, as between Scrushy and HealthSouth, HealthSouth has engaged in no inequitable conduct in connection with the Buyback. All it did was rely upon a market price premised upon financial statements prepared by Scrushy's management team and represented by him to be accurate to the best of his knowledge.[25] Second, and most important, the unclean hands doctrine is primarily a matter of public policy.[26] Here, it would work an injustice to permit Scrushy to shield himself from responsibility to HealthSouth for its reliance upon financial statements prepared under his own direction.

one of the common law doctrines fashioned to assure that transgressors will not be allowed to profit from their own wrongdoing.").

22. For similar reasons, Scrushy's attempt to impute to HealthSouth knowledge that its insiders possessed of the inaccuracy of the company's financial statements is futile. When corporate fiduciaries – such as HealthSouth managers – have a self-interest in concealing information – such as the falsity of the financial statements that they had helped prepare – their knowledge cannot be imputed to the corporation. *See* 18B Am.Jur.2d *Corporations* § 1680 (2003) ("An exception to the general rule that the knowledge of an officer or agent will be imputed to the corporation arises when an officer ... is acting in a transaction in which he is personally or adversely interested or is engaged in the perpetration of an independent fraudulent transaction, where the knowledge relates to such transaction and it would be to his interest to conceal it."). *See also Am. Standard Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 271 (5th Cir.1981) (quoting 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 819 (perm. ed., rev. vol. 1975) and articulating same rule). Logically, this exception to imputation applies with even more force in an action between an insider and the corporation. Here, imputation would be totally illogical. According to Scrushy, he – as CEO – had no knowledge of any improper accounting practices by his managerial subordinates. These subordinates performed their accounting-related duties for reasons wholly unconnected with the Buyback and, if they committed wrongdoing, had a motive to conceal that wrongdoing from the HealthSouth board. Given this reality, if Scrushy himself claims ignorance of wrongdoing by those who directly report to him, on what logical basis should HealthSouth be imputed to have knowledge of that wrongdoing in an action between itself and Scrushy?

23. *Cf. Ruckle v. Roto Am. Corp.*, 339 F.2d 24, 29 (2d Cir.1964) ("There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief [in a derivative action] solely because a fraud was committed by a director rather than by an outsider.").

24. *Seacord v. Seacord*, 139 A. 80, 81 (Del.Super.1927) ("[*In pari delicto* and unclean hands] ha[ve] always been regarded by courts of equity as without controlling force in all cases in which public policy is considered as advanced by allowing either party to sue for relief against the transaction.").

25. *See Nakahara v. NS 1991 American Trust*, 718 A.2d 518, 522 (Del.Ch.1998) (for doctrine of unclean hands to bar a claim, the plaintiff must have engaged in inequitable conduct that has an immediate and necessary relation to the claims at issue).

26. *Id.*

## VIII. *The Correct Remedy Is Rescission*

■■■■ In his answering brief, Scrushy raises a myriad of other insubstantial arguments designed to avoid summary judgment. They do not merit extended discussion.[27] Instead, I pause only to address

27. In summary form, some of these arguments and their resolution follows.

First, Scrushy argues that any injury HealthSouth suffered from the Buyback was offset by losses to Scrushy for purchasing HealthSouth stock at what he contends was an inflated price with the Loan proceeds in 1999. This argument is unavailing because set-off of a judgment is discretionary, *Pettinaro Constr. Co. v. Lindh*, 428 A.2d 1161, 1164 (Del.1981), and, in any event, there has been no judgment against HealthSouth whatsoever regarding Scrushy's purchase of its stock. Moreover, as between himself and HealthSouth, Scrushy has only himself to fault if he purchased stock at prices inflated because of the inaccuracy of financial statements he had signed as reliable. If he wishes to sue his subordinates or HealthSouth for recompense, he can do so. In any event, the record evidence indisputably shows that Scrushy made a trading gain of over $54 million exercising options and immediately selling HealthSouth stock on May 14, 2002, a mere two-and-a-half months before the Buyback. That is, the record does not support any tug of equity or law that would justify off-setting Scrushy's responsibility for the Buyback to compensate him for injuries he claims to have suffered because he purchased shares in 1999 at what he now argues might have been an inflated price of $5.78, when he sold many of them back to HealthSouth at $10.06 a piece.

Second, Scrushy argues that the HealthSouth Loan Plan shields Scrushy because it contains a provision immunizing the Board for liability to the corporation, any stockholder or any employee for any action or determination made under the Plan. This provision plainly acts as a shield for Board members in administering the plan on behalf of HealthSouth and not as a shield for Scrushy, who acted in the Buyback solely as a self-interested borrower, and not as a member of the Board. As Scrushy's own brief contends, Scrushy actually argued that an even higher price tied to the market price of July 1, 2002 should have been used in the Buyback.

Third, Scrushy argues that HealthSouth was engaged in a stock repurchase program as of 2002 and would have bought stock in the market if it had not accepted Scrushy's in the Buyback as repayment of the Loan. That proposition is belied by HealthSouth's actual market purchases, which had slowed to a trickle by 2002. More important, the fact that innocent public holders of HealthSouth stock might have been given the opportunity to get out before the crisis at HealthSouth had the Buyback not occurred does not aid Scrushy, an insider who was responsible for ensuring the preparation of accurate financial statements.

Fourth, Scrushy argues that the Buyback had an underlying business rationale, as it allowed HealthSouth to retire a loan to an insider at a time when federal law had made it illegal to make such loans in the future, permitted HealthSouth to acquire more of its stock and thereby help it finish its repurchase goal set in early 1999 (although this goal was set some three years earlier and the company's purchases had essentially ceased), and avoided having Scrushy sell his shares into the market to come up with the repayment price (even though Scrushy sold over $74 million in shares in May 2002). Whether or not these purposes are legitimate, the fact remains that the price of the Buyback was important to HealthSouth and the market price used was not fair to HealthSouth. The purportedly legitimate business rationale for HealthSouth's acceptance of Scrushy's shares in the Buyback does not justify allowing him to retain the benefits of a pricing formula tied to an unreliable market price tainted by materially inaccurate financial statements prepared by Scrushy's own management team and signed by him.

Fifth, Scrushy argues that a claim for unjust enrichment cannot be made here because he procured and repaid the Loan under a specific contract, the Loan Plan. This argument fails because Scrushy has not provided the Loan contract itself or shown how either its provisions or those of the Loan Plan are inconsistent with the maintenance of an unjust enrichment claim. The issue here is not the amount that Scrushy owed – that is known – but the fact that he was able to pay by transferring property (HealthSouth stock) that was thought to be worth that amount because it was based on the stock market price. This is not, therefore, a case in which conduct that was permissible under a specific contractual provision is argued to, nonethe-

Scrushy's argument that it is premature for this court to determine a remedy because there are complicated factual questions that preclude the imposition of an immediate remedy.

The reality is that it just isn't so. This is a situation in which rescission is a warranted and fitting remedy, whether considered as restitution for the unjust enrichment count or as an equitable remedy for the misrepresentation count. The plaintiffs asserted their claims regarding the Buyback very promptly, putting Scrushy on notice early after he caused Health-South to issue the August 2002 press release regarding the effect of the changes in the CMS Reimbursement Policy, an announcement that caused a plunge in HealthSouth's stock price. The economic premise on which HealthSouth based the Buyback was unsound, and unfair to it, and correspondingly too generous to Scrushy. HealthSouth is entitled to rescissory relief. The mechanism for granting that relief is simple: HealthSouth shall return to Scrushy the shares it received from him in the Buyback. In return, Scrushy's Loan will be treated as reinstated as of the date of the Buyback. Scrushy shall then pay to HealthSouth the amount of principal and interest that would have been owing to HealthSouth on the date that the Loan would have become payable in full absent the Buyback – 30 days from Scrushy's March 31, 2003 termination. In addition to that sum, Scrushy shall pay pre-judgment interest on the prior sum, running at the contract Loan rate from that date until the date that judgment is entered. With the assistance of counsel for HealthSouth and with notice as to form from Scrushy's counsel, the plaintiffs'

counsel should prepare a judgment incorporating that concept. Plaintiffs' counsel shall also confer with counsel for Health-South and see if agreement can be reached on an appropriate fee award and, if not, shall establish a schedule for the prompt presentation of a request for fees.

## IX. *Conclusion*

For the foregoing reasons, the plaintiffs' motion for summary judgment is granted as to the counts of the amended complaint against defendant Scrushy for unjust enrichment and equitable fraud.[28] The order contemplated by this opinion shall be submitted within ten days.

---

less, have unjustly enriched the party undertaking that action.

28. Because the plaintiffs succeed on their other theories, I do not reach their argument that the Buyback was void because it was not approved by the board's Audit and Compensa-

tion Committee in accordance with the literal terms of the Loan Plan, but rather was approved only by the Compensation Committee. Apparently, the Audit and Compensation Committee was split into two in March 2000.