# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Elmer Fannin and Sugar Loaf Farms, Inc. | ) ) ) | C.A. No. 9404-MA |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Ivy Tree Meadows, LLC, | ) ) | |
| Defendant. | ) | |

## MASTER'S REPORT

Date Submitted: August 5, 2016
Draft Report: November 28, 2016
Final Report: April 21, 2017

In October 2013, the owner of a 54-acre farm ("the Property") in Kent County, Delaware executed an agreement to sell the Property for $1,150,000 to a limited liability company based in New Jersey. The contract was a cash contract, and the only explicit contingency beyond good title was if there were hazardous substances on the Property. The original closing date was extended to December 19th, but on that date the buyer canceled the contract claiming that it could not develop 153 building lots on the Property due to the presence of wetlands and wetland buffers. After unsuccessfully trying to close the deal, the seller of the Property filed a complaint seeking specific performance of the contract. Pending before me are cross-motions for summary judgment. For the reasons that follow, I recommend that the Court grant summary judgment on the seller's request for specific performance of the

contract, but deny summary judgment on the seller's request for attorney's fees and costs.

Factual Background[1]

Plaintiff Sugar Loaf Farms, Inc. ("Sugar Loaf") is the owner of three parcels of land in Kent County totaling approximately 54 acres. Plaintiff Elmer Fannin is the president of Sugar Loaf. Although the Property was not listed for sale, during the late summer of 2013, Fannin was contacted by Jeanne Palumbo, a New Jersey real estate agent and broker for Quinrick Realty, LLC, ("Quinrick Realty") who was acting on behalf of a client potentially interested in buying the Property. Palumbo traveled to Kent County, visited the Property, and met with Fannin. Fannin provided Palumbo with a copy of a 2005 sketch plan ("the Sketch Plan") showing a proposed layout of 153 lots, which had been prepared the purpose of applying to the county's sewage disposal district for an allocation of sewer capacity. The Sketch Plan contained contour lines clearly indicating the existence of wetlands, which Fannin brought to Palumbo's attention. Fannin also informed Palumbo that the Sketch Plan had not been approved by Kent County for anything other than an equivalent dwelling unit (EDU) allocation so the Property could be connected to sewer, if and when the Property was approved for development. Fannin gave Palumbo a copy of the Kent County Sewage Disposal District Map ("District Map") showing the

Property in a proposed expansion of the county's sewage disposal system. Sewer was approved for 145 proposed lots depicted on the Sketch Plan.

On September 17th, Palumbo, acting as an agent for Defendant Ivy Tree Meadows, LLC ("Ivy Tree"), sent Fannin a proposed agreement of sale to purchase the Property for $818,018, subject to a contingency allowing termination in the event any hazardous substances, floodplains or wetlands were discovered on the Property during an inspection. Fannin rejected the offer because the price was too low and because Palumbo was aware there were wetlands on the Property. On September 24th, Fannin sent Palumbo a five-page document by facsimile, identifying "153 paper lots" and listing the improvements to the Property and personalty located thereon. Fannin offered to sell the Property with its improvements for $1,350,000 and the personalty for $85,000. Palumbo countered with offer to purchase the Property with its improvements for $919,018. Fannin revised the proposed agreement by eliminating the contingency related to floodplains and wetlands and increasing the sales price to $1,150,000, and on October 2nd, he signed the revised agreement of sale and sent it to Palumbo. On October 4th, Christine Beikman, managing member of Ivy Tree, signed the revised agreement of sale. Ivy Tree then paid a deposit of $10,000 to Quinrick Realty, to be held in escrow. Since the contract was a cash contract that did

---

[1] The factual background is taken from the undisputed allegations of the Amended Complaint and the affidavits supporting the cross-motions for summary judgment.

not contain a financing contingency, the closing date stated in the contract was November 19, 2013.

A week before the settlement date, Fannin's attorney sent a letter to Ivy Tree's attorney regarding settlement matters. In response, on November 15, 2013, the attorney informed Fannin's attorney that Ivy Tree would not be able to complete closing on November 19th because it had decided to obtain financing of a portion of the purchase price. Although Fannin was ready, willing and able to complete settlement on November 19th, based on Ivy Tree's representation that the delay in closing would only be two weeks, Fannin agreed to extend the closing date from November 19 to December 19, 2013, without modifying any other contract terms.

In mid-December, Ivy Tree or Palumbo contacted Fannin directly to request a second extension of the closing date from December 19 to January 30, 2014, and offered to make partial payment of the purchase price in the amount of $200,000 if Fannin would agree to this extension request. Fannin agreed to extend the closing date a second time in exchange for the partial payment of $200,000, and signed a second Contract Addendum extending the closing date to January 30th. Although Fannin was verbally informed that Ivy Tree was going to sign the second addendum and wire the $200,000 to Fannin's attorney on December 19th, Ivy Tree sent a letter to its realtor on December 19th, stating that it was cancelling the contract based on the belief it could not develop the Property into 153 building lots due to wetlands and

wetlands buffers. On December 20th, Fannin's attorney sent Ivy Tree's realtor a letter directing her not to refund the $10,000 deposit to Ivy Tree, and informing the realtor of her obligation to pay the deposit to Fannin based on Ivy Tree's default and breach of contract. Despite Fannin's attempt to resolve this matter by granting an extension until February 21, 2014, for Ivy Tree to complete its purchase of the Property, Ivy Tree never completed the purchase of the Property or expressed any intent to do so.

## Procedural Background

On February 28, 2014, Plaintiff[2] filed a complaint in this Court seeking specific performance of the contract and damages. The complaint was amended on April 14, 2014, and on May 7th, Ivy Tree filed its answer to the amended complaint. After some discovery issues were resolved, the case stalled for nearly a year, prompting the Court to threaten dismissal under Court of Chancery Rule 41(e). Shortly thereafter, on May 16, 2016, Plaintiff filed a motion for summary judgment, and on June 20th, Ivy Tree filed its cross motion for summary judgment. Both motions now have been fully briefed.

## Issues

Plaintiff argues that it is undisputed the parties had a valid enforceable contract to purchase the Property. After engaging in several rounds of negotiations, Ivy Tree accepted Plaintiff's offer to sell the Property for $1,150,000, and signed the revised

---

[2] Plaintiff refers to both Fannin and Sugar Loaf unless otherwise indicated.

agreement of sale. Ivy Tree's deposit of $10,000 was further proof that it intended to be bound by the contract. According to Plaintiff, the terms of the written agreement were sufficiently definite, and did not contain any contingencies related to the number of lots, financing, or the existence of wetlands or wetland buffers. Ivy Tree's subsequent notice of intent to cancel was an anticipatory breach or repudiation of the contract, and Ivy Tree's subsequent refusal to perform the contract resulted in a breach. The reason for repudiating the contract, i.e., Ivy Tree's inability to develop 153 lots due to the existence of wetlands and wetland buffers, was not a valid reason for repudiating the contract. At all times Ivy Tree had been aware that the "153 paper lots" listed on the Sketch Plan meant proposed lots, and not lots applied for or approved by any governmental entity. Most significantly, the agreement of sale did not contain any contingencies related to wetlands or wetland buffers, or the number of lots that could be developed. Plaintiff argues that Ivy Tree's unjustified repudiation of the contract constitutes bad faith entitling Plaintiff to attorney's fees and costs. Finally, Plaintiff argues that it was ready, willing and able to perform under the contract at all times.

Ivy Tree argues that Plaintiff is not entitled to summary judgment in its favor because Plaintiff misrepresented to Ivy Tree the number of lots that were available for development. Plaintiff gave Ivy Tree's agent, Palumbo, a plan showing a total of 153 lots available for development, and the contract between the parties referred

specifically to a sketch plan showing "Sugar Loaf Farms" consisting of the 153 lots. According to Ivy Tree, Plaintiff's misrepresentation concerning the number of lots materially altered the contract so that Ivy Tree's notice of its intent to cancel was not an anticipatory breach or repudiation of the contract. Ivy Tree could not perform under the contract because there were significantly fewer lots to develop; thus, a material term of the contract had changed. Since Plaintiff concedes that the existence of wetlands and wetland buffers could affect the number of lots that could be developed, Ivy Tree argues that Plaintiff appears to concede that there was a material mistake of fact that may be grounds for rescission of the contract. Furthermore, Plaintiff was not ready, willing and able to perform because it could not deliver a property that would yield 153 lots for development.

In its cross-motion for summary judgment, Ivy Tree argues that Plaintiff's misstatements or misrepresentations concerning the number of lots available to be developed are grounds for rescission of the contract. According to Ivy Tree, its decision to purchase the Property was based, in part, on what appeared to be 153 lots available for development. Now, it appears that the number of lots will be fewer than 153 due to the existence of wetlands and wetland buffers. If this discrepancy is not a material misrepresentation by Plaintiff, then it is evidence of a mutual mistake of fact by the parties. Furthermore, Ivy Tree did not assume the risk of a mistake because the contract was silent as to the risk of mistake.

In response, Plaintiff argues that there was no misrepresentation or mistake because Ivy Tree was at all times aware that the "153 paper lots" listed on the Sketch Plan meant only proposed lots, and the Sketch Plan clearly identified the wetlands information. Ivy Tree was in possession of this document prior to signing the contracts of sale and, therefore, had notice of the existence of wetlands and wetland buffers and their potential impact on the number of developable lots that may ultimately be realized on the Property. Plaintiff argues that there was never an assumption that the land would be approved for 153 lots, and Ivy Tree knew it had limited knowledge with respect to the number of developable lots. Since Ivy Tree did not request any further information from Plaintiff and did not seek any survey or delineation report regarding the wetlands and/or wetland buffers and the number of developable lots, the risk of mistake should be allocated to Ivy Tree.

Standard of Review

The Court shall grant a motion for summary judgment when, "after reviewing the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits," the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[3] Where cross motions for summary judgment are pending, and "the parties have not argued that there is an issue of fact material to the disposition of either motion," then they are

deemed by the Court to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[4]

Analysis

In support of its motion for summary judgment, Plaintiff submitted the following documents: (a) the agreement of sale dated October 4, 2013; (b) Ivy Tree's proposed agreement of sale dated September 17, 2013; (c) several emails from or to Palumbo; (d) Ivy Tree's Exclusive Buyer Agency Agreement with Palumbo; (e) excerpts from Palumbo's deposition transcript; (f) portions of the Sketch Plan and the District Map; (g) letters from the parties' counsel; (h) addendum to the agreement of sale dated November 19, 2013; and (i) excerpts from Ivy Tree's responses to interrogatories. Plaintiff also supported its motion for summary judgment with Fannin's four-page affidavit. Ivy Tree supported its motion for summary judgment with Palumbo's affidavit. Plaintiff contends that it is entitled to summary judgment on its request for specific enforcement of the contract while Ivy Tree contends that it is entitled to summary judgment on its request for rescission of the contract.

The parties do not dispute that a valid contract was created. Nevertheless, Ivy Tree is seeking rescission of the contract. A party is entitled to rescission of a contract for the sale of real property on the basis of fraud, misrepresentation, or

---

[3] *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch.R. 56(c)).
[4] Ct.Ch.R. 56(h).

mistake.[5]  Here, Ivy Tree claims that Plaintiff misrepresented the number of lots that were developable on the Property and, because of the existence of wetlands, 153 lots cannot be developed on the Property.  However, there is no evidence of any misrepresentation by Plaintiff.  Before the agreement of sale was executed, Ivy Tree's agent was informed of the existence of wetlands on the Property, and the agent knew that the 153 lots shown on the Sketch Plan were only proposed or paper lots laid out for the sole purpose of applying for sewer allocation.[6]  The agent knew that the proposed 153 lots shown on the Sketch Plan had not been approved for development.  The agent's knowledge may be imputed to her principal, Ivy Tree.[7]

The record shows that Palumbo and a colleague visited the Property before meeting with Fannin and declined an opportunity to make another site visit with Fannin.  Palumbo was informed of the presence of wetlands on the Property during the meeting, and was again informed of the existence of wetlands when Fannin refused to sign the proposed agreement of sale that contained an explicit contingency for wetlands.[8]  Palumbo sent Fannin a second proposal that no longer contained any contingencies related to the discovery of floodplains or wetlands, which is further

---

[5] *Liberto v. Bensinger*, 1999 WL 1313662, at * 5 (Del. Ch.  Dec. 28, 1999).

[6] Appendix to Plaintiffs' Opening Brief in Support of Motion for Summary Judgment ("A-#"), at pp. 19, 40.

[7] *Williams v. White Oak Builders, Inc.* 2006 WL 1668348, at *6 n. 91 (citing *In re HealthSouth Corp. S'holders Litig.,* 845 A.2d 1096, 1108 n.22 (Del. Ch. 2003) (noting general rule that the knowledge of an agent is imputed to its principal)).

[8] A-4-7.

evidence of Palumbo's awareness of the presence of wetlands on the Property.[9] Palumbo was given copies of: (1) the Sketch Plan, which depicts both "404 wetland lines" and "100 year flood plain limits" on the Property;[10] and (2) the District Map showing the proposed sewer extension to the Property if it was subsequently approved for development.[11]

Palumbo returned to her office with the paperwork she had received from Fannin. Palumbo drafted the proposed agreement of sale, and in her draft Palumbo described the property to be sold as follows:[12]

> (a) The land and all the buildings, other improvements and fixtures to the land; (b) all of the Seller's rights relating to the land; (c) all personal property specifically made reference to in this contract. The sale excludes any and all equipment, which is to be removed by seller through auction or other means within ninety (90) days from date of settlement. The real property to be sold is commonly known as: Parcel # 3-00-05600-01-0200-00101 at 6952 Pearsons Corner Road, town of Hartley (Dover Metro area), County of Kent, state of Delaware. The land consists of 53.98 acres. There exists a site plan sketch for "Sugar Loaf Farms" which consists of 153 building lots. The sale also includes ownership rights in any and all municipal/governmental approvals obtained that run with the land.[13]

---

[9] A-1-3.

[10] A-14-17

[11] A-18, 45. Sewer had been approved for 145 of the proposed lots depicted on the Sketch Plan. Affidavit of Elmer G. Fannin, at ¶ 6.

[12] A-12, 19.

[13] A-1,4.

Although Palumbo included a reference to the Sketch Plan in her proposed agreement of sale, she omitted any reference to the District Map. Nevertheless, Palumbo knew that the Sketch Plan showed only proposed lots, as opposed to approved lots. Palumbo knew that there was a map showing the approved sewage disposal capacity for the Property. Palumbo also knew that there were wetlands on the Property. Moreover, by explicitly referring to the Sketch Plan in the proposed agreement of sale, Palumbo incorporated this document into the parties' executed contract.[14] Not only did the Sketch Plan depict wetlands contour lines throughout the proposed site plan of 153 lots, it also contained the following notations:

> Boundary information shown hereon was taken from a plat prepared by Earl D. Smith, Inc., Land Surveyor, titled "Sugar Loaf Stables," dated 6-22-87 and is not the result of an actual field survey by Design Consultants Group, L.L.C.
> Wetlands information was obtained from public information on the Kent County, Delaware website, and is not the result of any delineation or survey.
> Layout may not reflect all code requirements of Kent County.[15]

A reasonably prudent buyer interested in developing the Property would have: (a) taken the opportunity to inspect the Property and to obtain an official (as opposed to approximate) wetlands delineation report; (b) contacted the Kent County Planning and Zoning office regarding zoning or the developmental status of the Property; and

---

[14] *See McKinney Family Ltd. P'ship v. Stubbs*, 2007 WL 1883121 (Del. July 2, 2007).

(c) contacted Kent County to confirm the sewage disposal capacity of the Property. Despite having the information contained in the Sketch Plan and District Map, Ivy Tree made no inquiries about zoning requirements or the presence of wetlands on the Property before executing the contract on October 4, 2013.[16]

Even disregarding the imputed knowledge of its agent, if Ivy Tree believed that the Property contained 153 developable lots because of the reference in the contract to a "site plan sketch … which consists of 153 building lots,"[17] the Sketch Plan itself contained sufficient "qualifying information" to have cured such a mistaken belief.[18] Ivy Tree's unjustified reliance on this statement in the contract drafted by its agent is not a basis for rescission of the contract due to misrepresentation.

Nor is Ivy Tree entitled to rescission on the ground of mistake because in this case, Ivy Tree bore the risk of mistake. Delaware courts follow the Restatement (Second) of Contracts' approach to determining which party bears the risk of a mistake. Under Section 152 of the Restatement, a party bears the risk of mistake when:

> (a) The risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the fact to which the mistake relates but treats his limited

---

[15] A-14.
[16] A-34-35.
[17] A-1.
[18] *Norton v. Poplos*, 443 A.2d 1, 5 (Del. 1982).

> knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable under the circumstances to do so.[19]

The record shows that Ivy Tree and Palumbo entered into an exclusive buyer agency agreement on August 1, 2013, in which Palumbo agreed to search for, locate, and purchase real estate in Kent County for Ivy Tree.[20] Sometime that summer, Palumbo and a colleague visited the Property. They drove down a paved driveway, but did not get out and walk around the Property. Nor did Palumbo take any pictures of the Property.[21] After Palumbo and her colleague talked with Fannin in his Milford office,[22] she returned to her office with the documents Fannin had provided. Palumbo was not an engineer or developer; she was a realtor just looking for land that might be developed.[23] Palumbo did not even know to ask whether the Sketch Plan had received any governmental approval.[24] She admitted that she did not spend much time looking at the Sketch Plan and that she did not read the notes on the Sketch Plan.[25] Palumbo did not report to anyone nor did anyone ask her for additional information after she delivered the documents to Ivy Tree.[26]

---

[19] *Darnell v. Myers*, 1998 WL 294012, at *7 (Del. Ch. May 27, 1998) (quoting Restatement (Second) of Contracts § 152 (1981)).
[20] A-9.
[21] A-13.
[22] A-12.
[23] A-42-43.
[24] A-43.
[25] A-45.
[26] A-13.

Palumbo transmitted Ivy Tree's initial offer to purchase the Property to Fannin on September 17th. Less than three weeks later, the parties signed the agreement of sale – Fannin on October 2nd and Ivy Tree on October 4th - in which there were no contingencies relating to wetlands, floodplains, the number of developable lots, or financing. Ivy Tree was willing to proceed with the contract even though it was aware that it had minimal information about the Property. Ivy Tree was willing to proceed with the contract even though it was aware that its request for a contingency relating to wetlands and floodplains had been rejected by the other party. In its haste to acquire the land, Ivy Tree took the risk that it could be mistaken as to the number of developable lots on the Property. As a result, Ivy Tree is barred from seeking rescission of the contract on the grounds of mistake. And Plaintiff is entitled to specific performance of its contract because at all times, it was ready, willing, and able to convey 53.98 acres of land to Ivy Tree in exchange for $1,150,000, and the contract did not contain a liquidated damages clause.

Plaintiff is also seeking to shift its attorneys' fees and costs to Ivy Tree because of Ivy Tree's alleged bad faith in repudiating and breaching the contract and for asserting frivolous reasons for its anticipatory breach and repudiation. Ivy Tree argues that Plaintiff has failed to demonstrate any strong public policy or any egregious conduct that would justify an award of attorneys' fees or costs. In

particular, Ivy Tree argues that even if it had breached the contract, such conduct would not amount to "vexatious, wanton, or oppressive conduct" in any way.[27]

The bad-faith exception to the American Rule that each side bears its own attorney's fees does not apply to the conduct that gives rise to the claim itself, although a court may consider the losing party's conduct prior to litigation as evidence for the purpose of determining whether the party defended the action in bad faith.[28] Nevertheless, the bad-faith exception may apply "where the pre-litigation conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages."[29] Here, there is no indication that Ivy Tree "'unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims[,] … mis[led] the court, alter[ed] testimony, or chang[ed] position on an issue.'"[30] There was nothing egregious about either the circumstances surrounding Ivy Tree's breach of contract or the ensuing litigation. Plaintiff has failed to demonstrate as a matter of law any strong public policy in favor of awarding attorneys fees in this case, or that it would be inequitable to require each party to bear its own attorneys' fees and costs. Therefore, I recommend that the Court deny

---

[27] Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment, at 10.
[28] *See Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998).
[29] *Choupak v. Rivkin,* 2015 WL 1589610, at * (Del. Ch. April 6, 2015) (quoting *Hardy v. Hardy*, 2014 WL 3736331, at *17 (Del. Ch. July 2014)).

Plaintiff's motion for summary judgment in part as to its request for an award of fees and costs.

## Exceptions

Both parties have filed exceptions to the Draft Report. After reviewing the parties' briefs, I see no reason to modify my recommendation that the Court deny Defendant's cross-motion for summary judgment as to its request for rescission of contract. Plaintiffs' sole exception pertains to the Draft Report's failure to include a deadline for specific performance by Defendant. Therefore, I am modifying the Draft Report by recommending that, in addition to granting Plaintiffs' motion for summary judgment as to its request for specific performance, the Court should require Defendant to complete the purchase of the land and improvements which are the subject of the cash contract at issue within sixty (60) days after this report becomes final.

## Conclusion

For the reasons stated above, I recommend that the Court grant summary judgment in part in favor of Plaintiffs Elmer Fannin and Sugar Loaf Farms, Inc. as to their request for specific performance within 60 days of the agreement of sale of the Property for $1,150,000 to Defendant Ivy Tree Meadows, LLC, and deny

---

[30] *Dover Historical Soc., Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1093 (Del. 2006) (quoting *Beck v. Atlantic Coast PLC*, 868 A.2d 840, 850-51 (Del.

Defendant's motion for summary judgment as to its request for rescission of contract. In addition, I recommend that Court deny summary judgment in part as to Plaintiffs' request for an award of attorneys' fees and costs. The parties are referred to Court of Chancery Rule 144 for the process of taking exception to a Master's Final Report.

Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery

KEA/kekz

---

Ch. 2005)).