IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LAVASTONE CAPITAL LLC, | § | |
| | § | No. 75, 2021 |
| Defendant - Appellant, | § | |
| | § | Certification of Questions of Law |
| v. | § | from The United States District |
| | § | Court for the District of Delaware |
| | § | |
| ESTATE OF BEVERLY E. | § | C.A. No. 1:18-cv-02002-SB |
| BERLAND, | § | |
| | § | |
| Plaintiff - Appellee. | § | |

Submitted: September 15, 2021
Decided: November 16, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon Certification of Questions of Law from The United States District Court for the District of Delaware. **CERTIFIED QUESTIONS ANSWERED**

Kenneth J. Nachbar, Esquire (*argued*), Megan Ward Cascio, Esquire, and Sabrina M. Hendershot, Esquire, Morris, Nichols, Arsht, & Tunnell, LLP, Wilmington, Delaware, for Appellant.

Daniel R. Miller, Esquire, Walden, Macht & Haran, LLP, Philadelphia, Pennsylvania, for Appellee.

David E. Ross, Esquire, Ross Aronstam & Moritz, LLP, Wilmington, Delaware, *Amici Curiae* for the Life Insurance Settlement Association and European Life Settlement Association.

Stephen B. Brauerman, Esquire, Bayard, P.A., Wilmington, Delaware, *Amici Curiae* for Institutional Longevity Markets Association.

**VAUGHN,** Justice.

The United States District Court for the District of Delaware certified the following three questions of law to this Court in accordance with the Delaware Constitution, Article IV, § 11(8) and Delaware Supreme Court Rule 41:

> *Question One*:  If an insurance contract is void *ab initio* under 18 *Del. C.* § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust*, 28 A.3d 1059 (Del. 2011), is any resulting death-benefit payment made "under any contract" within the meaning of 18 *Del. C.* § 2704(b)?

> *Question Two:*  Does 18 *Del. C.* § 2704(a) and (c)(5) forbid an insured or his or her trust to procure or effect a policy on his or her own life using a nonrecourse loan and, after the contestability period has passed, transfer the policy, or a beneficial interest in the trust that owns the policy, to a person without an insurable interest in the insured's life, if the insured did not ever intend to provide insurance protection beyond the contestability period?

> *Question Three*:  May an estate profit under 18 *Del. C.* § 2704(b) if an insurance policy in violation of 18 *Del. C.* § 2704(a) was procured in part by fraud on the part of the decedent and the decedent profited from the previous sale of the policy?

By order dated March 12, 2021, this Court accepted the certified questions. For the reasons discussed in this opinion, we answer the certified questions as follows.

> *Question One*:  Yes, a death-benefit payment that is made on a policy that is void *ab initio* under 18 *Del. C.* § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust* is made "under [a] contract" within the meaning of 18 *Del. C.* § 2704(b).

> *Question Two*:  No, so long as the use of nonrecourse funding did not allow the insured or his or her trust to obtain the policy "without

actually paying the premiums"[1] and the insured or his or her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract.

*Question Three*: Yes, an estate may profit under 18 *Del. C.* § 2704(b) where the policy was procured in part by fraud on the part of the decedent and the decedent profited from the previous sale of the policy, if the recipient of the policy benefits cannot establish that it was a victim of the fraud.

## I.      Factual and Procedural Background

The following undisputed facts have been submitted with the certification.

Beginning in 2001, Lavastone Capital LLC (Lavastone) entered into an agreement with Coventry First LLC (Coventry) to purchase "life settlements" – life-insurance policies sold on the secondary market. Lavastone bought many life-insurance policies from Coventry through this arrangement. One was that of Beverly E. Berland. Lincoln Financial (Lincoln), not a party here, issued the policy to Berland in 2006. But Berland did not act alone in acquiring it. A few months before, she approached a business called "Simba," hoping to engage in a "life insurance capacity transaction." As Simba pitched it, the transaction allowed clients to "create dollars today by using a paper asset, (a life insurance policy not yet issued from a major insurance carrier insuring your life)" by selling it on the secondary market. Clients did not need to put up any money upfront. Instead, they got nonrecourse

---

[1] *PHL Variable Insurance Co. v Price Dawe 2006 Insurance Trust*, 28 A.3d 1059, 1076 (Del. 2011).

loans to finance the transactions, which allowed them to make all necessary payments without tapping into personal funds. The only collateral for the loan was the life-insurance policy itself. Simba played the role of a broker in these transactions, reaching out to both the insurers and banks on behalf of its client.

Berland agreed to participate in several transactions with Simba, profiting greatly. But only one transaction is at issue here.

1. *Financing the premium payments.* To get a nonrecourse loan for Berland, Simba got her medical records under a HIPAA release and sent them to Coventry Capital I LLC (Coventry Capital). Coventry Capital was the lending-program administrator for LaSalle Bank (LaSalle) (which was to be the lender for the premium payments) and facilitated creating a life-expectancy report through another entity, Coventry Servicing LLC (Coventry Servicing). Coventry Servicing then sent the report to Lexington Bank (Lexington), which provided insurance for nonrecourse loans issued by LaSalle. After Lexington agreed to insure the Berland loan, LaSalle agreed to issue it.

The loan package created a trust, called the Berland Insurance Trust (the Trust). It had two trustees: the Wilmington Trust Company (Wilmington Trust) and Murray Roffeld, Berland's longtime partner. The loan's "borrower" was a sub-trust of the Trust, on whose behalf Wilmington Trust executed a Note and Security Agreement. The note could be satisfied by relinquishing the life-insurance policy

before the loan-maturity date. Otherwise, Berland assigned her interest in the Trust, sub-trust, and policy as collateral. The quarter-million-dollar loan was due twenty-six months from the issue date and had an effective interest rate of 20.52 percent.

2. *Acquiring the policy*. At that time, Berland also executed a "special irrevocable durable power of attorney." This allowed Coventry Capital to originate and service any life-insurance policy on behalf of Berland. Berland then applied for a $5 million Lincoln life-insurance policy. Included with her application was a form that falsely stated that she had $10 million in assets and $180,000 in annual income. After she signed the application, Simba submitted it to Coventry Capital. Coventry Capital then sent the application to Wilmington Trust, which signed the application as the Trust's trustee and policy owner. Lincoln then issued the policy, delivering it to the Trust at Wilmington Trust's address in Delaware. The parties dispute whether Simba or Berland paid the $5,000 application fee.

3. *Selling the policy*. The Trust maintained the policy for more than two years, past the contestability period. At no point did anybody other than Berland control whether or to whom Berland or the Trust could sell the policy. Indeed, when looking to sell the policy, Berland signed engagement letters with three separate life-settlement brokers. She ultimately accepted an offer brought by one of these brokers, Four Seasons Financial Group, in July 2008.

Coventry First, acting as a life-settlement provider for Lavastone, was the

5

buyer, paying $453,822.88.  Berland directed the trust to use this money to pay off the Note and Security Agreement.  She personally retained the remaining $73,594.05 surplus.  Coventry First then sold the agreement to Lavastone, per the two companies' prior contract.  Lavastone kept the policy in force, paying all relevant premiums to Lincoln Financial.  Upon Berland's death more than seven years later, Lincoln paid Lavastone $5,041,032.06 in death benefits under the policy.

In December 2018, Berland's estate filed a complaint against Lavastone in the District Court, seeking to recover the death benefits that Lavastone received under 18 *Del C.* § 2704(b).  On July 17, 2020, the parties filed cross-motions for summary judgment.  On March 2, 2021, the District Court certified the three questions of law to this Court.

## II.     Standard of Review

The certified questions are issues of law, which this Court decides *de novo*.[2]

## III. DISCUSSION

## A. Legal Background and *Price Dawe*

For hundreds of years, the law has prohibited wagering on human life through the use of life insurance that was not linked to a demonstrated economic risk.[3]

---

[2] *Id.* at 1064.

[3] *See id.* at 1069 (discussing historical background of the insurable interest requirement).  *See also Grigsby v. Russell*, 222 U.S. 149, 154 (1911) ("A contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end."); *Warnock v. Davis*, 104 U.S. 775, 779 (1881) ("[I]n all cases there must

6

Delaware has codified the requirement that a person procuring a life insurance policy must have an "insurable interest" in the life of the insured in 18 *Del. C.* § 2704. Section 2704(a) provides:

> Any individual of competent legal capacity may procure or effect an insurance contract upon his or her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

Section 2704(c) defines the categories of persons that have an insurable interest in an individual's life. The categories include the individual insured and others, such as close family members or business associates and the "trustee of a trust created and initially funded by" the insured.[4]

In *Price Dawe*, this Court answered questions of law certified by the United States District Court for the District of Delaware relating to the insurable interest requirement. In that case, Price Dawe formed an insurance trust with a family trust as the beneficiary. Dawe was the beneficiary of the family trust. On March 8, 2007, an insurer issued a $9 million life insurance policy on Dawe's life. The insurance

---

be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy.").

[4] 18 *Del. C.* § 2704(c)(5).

trust was the owner and beneficiary of the policy. Dawe died on March 3, 2010. After the insurance trust made a claim for the death benefit, the insurer contested the policy, claiming that Dawe did not qualify, and had no legitimate need, for a $9 million life insurance policy; that he had misrepresented his income and assets in the policy application; and that he was financially induced into participating in the transaction as part of a stranger-originated life insurance ("STOLI") scheme. Specifically, the insurer claimed that Dawe never intended to retain the policy and always intended that the policy would be immediately transferred to an unrelated, third-party investor, which had no insurable interest. The insurer claimed that the third-party investor in fact purchased the beneficial interest in the insurance trust from the family trust less than two months after the policy went into force.

After denying the insurance trust's motion to dismiss, the District Court certified three questions of law to this Court. In response to the certified questions, this Court held that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force."[5] Therefore, an insurer could challenge the validity of a life insurance policy based on a lack of insurable interest after the expiration of the contractual two-year contestability period required by 18 *Del. C.* § 2908.[6] The Court also held that 18 *Del. C.* § 2704(a) and (c)(5) do not

---

[5] *Price Dawe*, 28 A.3d at 1065.
[6] *Id.*

8

prohibit an insured from procuring or effecting a policy on his or her own life and immediately transferring the policy, or a beneficial interest in a trust that owns and is the beneficiary of the policy, to a person without an insurable interest in the insured's life—even if the insured never intended to provide insurance protection for a person with an insurable interest in the insured's life—so long as (i) the insured procured or effected the policy and (ii) the transaction is not a mere cover for a wager.[7] Finally, the Court held that a trust established by an individual insured has an insurable interest in the life of that individual when, at the time of the application for life insurance, the individual intends that the beneficial interest in the trust would be transferred to a third-party investor with no insurable interest in the individual's life following the issuance of the policy, but only if the individual insured created and funded the trust.[8]

## B. Question One.

In the first certified question, the District Court asks: "If an insurance contract is void *ab initio* under 18 *Del. C.* § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance* Trust, 28 A.3d 1059 (Del. 2011), is any resulting death-benefit payment made 'under any contract' within the meaning of 18 *Del. C.* § 2704(b)?"

---

[7] *Id.* at 1068.
[8] *Id.* at 1076.

In *Price Dawe*, an *en banc* opinion of this Court from 2011, the Court held that a life insurance contract that "lacks an insurable interest at inception" is "void *ab initio* because it violates Delaware's clear public policy against wagering."[9] A policy that is void *ab initio* "[n]ever legally came into effect," and a "court may never enforce [such an] agreement[]."[10] In light of that holding, the District Court queries in the first certified question in this case whether a death benefit that is paid on an insurance policy that lacks an insurable interest under 18 *Del. C.* § 2704(a) and *Price Dawe* is "made 'under any contract' within the meaning of 18 *Del. C.* § 2704(b)."

Section 2704(b) provides:

If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

Put differently, § 2704(b) directs that if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient.

The estate contends that § 2704(b) applies only to policies that lack an

---

[9] *Id.* at 1067-68. The Court explicitly rejected the argument that such a contract is merely voidable and not void. *Id.* at 1067.

[10] *Id.* at 1067-68.

insurable interest—and are therefore void *ab initio* under *Price Dawe*—and asserts that holding that a benefit paid under such a policy is not made "under [a] contract" would render § 2704(b) meaningless.  The estate further contends that § 2704(b) is ambiguous because "a literal reading of its terms 'would lead to an unreasonable or absurd result not contemplated by the legislature.'"[11]  It argues that the Court should therefore interpret the statute in accordance with "'its apparent purpose and place it as part of a broader statutory scheme'" and interpret the provision "'consistently with pre-existing common law.'"[12]  Because the "common law concept that the proceeds of a STOLI policy are payable to the insured's estate dates back at least 140 years,"[13] the estate contends that the Court should hold that a death benefit paid under a life insurance policy that is void *ab initio* due to the lack of an insurable interest is made "under [a] contract" within the meaning of § 2704(b).

Lavastone takes no position on this certified question, electing instead to rely on its argument—addressed under the second certified question—that the Berland policy did not lack an insurable interest.  Several *amici curiae* filed briefs in support of Lavastone, however.  *Amicus curiae* Institutional Longevity Markets Association ("ILMA") agrees with the estate that reading § 2704(b) to require the existence of an enforceable contract would render that section meaningless in light of *Price*

---

[11] Answering Brief at 17 (quoting *Price Dawe*, 28 A.3d at 1070).
[12] *Id.* (quoting *Price Dawe*, 28 A.3d at 1070).
[13] *Id.* at 17-18.

*Dawe*'s holding that a policy that lacks an insurable interest is void from the outset.[14]

But ILMA urges that the interpretive remedy is to "reexamine *Price Dawe*'s holding that policies that violate § 2704(a) are void" and to conclude that the General Assembly's creation of a remedy in § 2704(b) that depends on the existence of a "contract" abrogates the common law principle that life insurance policies that lack an insurable interest are void.[15]

In *Price Dawe*, this Court determined that the General Assembly intended to codify—not abrogate—the common law insurable interest requirement when it enacted § 2704(a).[16] The Court expressly held that insurance policies that lack an insurable interest are void, as opposed to voidable.[17] "Once a point of law has been settled by decision of this Court, it forms a precedent which is not afterwards to be departed from or lightly overruled or set aside and it should be followed except for urgent reasons and upon clear manifestation of error."[18] The Court can reconcile §§ 2704(a) and (b) without modifying *Price Dawe*. Courts have recognized that the

---

[14] *See* Brief of Amicus Curiae Institutional Longevity Markets Association in Support of Appellant Lavastone Capital LLC Requesting that the Court Answer the Three Certified Question in the Negative, at 7, *Lavastone Capital LLC v. Estate of Beverly E. Berland*, No. 75, 2021 (Del. filed Apr. 29, 2021) ("Any other construction would render § 2704(b) meaningless—if a violation of § 2704(a) retroactively eliminated the existence of the contract, an estate would never be able to recover any benefits paid 'under any contract'").

[15] *Id.* at 10-11.

[16] *Price Dawe*, 28 A.3d at 1072-73.

[17] *See id.* at 1067-68 ("Under Delaware common law, contracts that offend public policy or harm the public are deemed *void* as opposed to voidable. . . . Under Delaware common law, if a life insurance policy lacks an insurable interest at inception, it is void *ab initio*. . . .").

[18] *Account v. Hilton Hotels Corp.*, 780 A.2d 245, 248 (Del. 2001) (internal quotations and alterations omitted).

word "contract" is "sometimes anomalously" used to refer to or describe what is actually a void—that is, nonexistent—agreement between parties.[19]  Reading § 2704(b) in this light, it appears that the General Assembly used "contract" to refer to the document that defines the death benefit and identifies the "beneficiary, assignee or other payee," rather than to mean that an enforceable contract must exist before an estate can recover death benefits paid on a policy that lacks an insurable interest.  For these reasons, our answer to the first certified question is Yes, a death-benefit payment that is made on a policy that is void *ab initio* under 18 *Del. C.* § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust* is made "under [a] contract" within the meaning of 18 *Del. C.* § 2704(b).

## C. Question 2

In the second certified question, the District Court asks:  "Does 18 *Del. C.* § 2704(a) and (c)(5) forbid an insured or his or her trust to procure or effect a policy on his or her own life using a non-recourse loan and, after the contestability period has passed, transfer the policy, or a beneficial interest in a trust that owns the policy, to a person without an insurable interest in the insured's life, if the insured did not ever intend to provide insurance protection beyond the contestability period?"

---

[19] *Price Dawe*, 28 A.3d at 1067 (quoting *Dougherty v. Mieczkowski*, 661 F. Supp. 267, 274 (D. Del. 1987)); *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, 28 A.3d 436, 441 (Del. 2011) (quoting *Dougherty*).  *See also generally Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979) (discussing federal statute that "declar[es] certain contracts void").

Lavastone contends that a life insurance policy obtained by the insured with premium financing is supported by an insurable interest and is freely transferable so long as it complies with *Price Dawe* and the Delaware Viatical Settlements Act. The estate admits that a life insurance policy obtained by the insured with premium financing is not *per se* an unlawful wager and is freely transferable if the policy complies with Delaware law, but contends that the policy in question in this case fails to comply with Delaware law and *Price Dawe*, or were it applicable, the Delaware Viatical Settlements Act.[20]

As discussed above, Section 2704(a) establishes the insurable interest requirement. Section 2704(c)(5) provides, in part:

> The trustee of a trust created and initially funded by an individual has an insurable interest in the life of that individual . . . . The trustee of a trust has the same insurable interest in the life of any individual as does any person with respect to proceeds of insurance on the life of such individual (or any portion of such proceeds) that are allocable to such person's interest in such trust. . . .

The analysis in *Price Dawe* emphasizes two considerations when evaluating whether a policy lacks an insurable interest: (1) whether the insured or the trustee of the insured's trust obtained the policy in good faith and for a lawful insurance purpose, and not as a cover for a wagering contract;[21] and (2) the source of the

---

[20] In answering the certified questions, we do not find it necessary to address the Delaware Viatical Settlements Act.

[21] *See Price Dawe*, 28 A.3d at 1075 ("[I]f an insured procures a policy as a mere cover for a wager, then the insurable interest requirement is not satisfied."); *id.* ("An insured's right to take out a

14

funding for the premiums.[22]  In essence, the second certified question in this case asks how these considerations apply where (i) the source of the funding is a nonrecourse loan and not any assets of the insured and (ii) the insured's intent was to transfer ownership after the end of the contestability period, rather than "immediately" as in *Price Dawe*.

Price Dawe directs courts to determine who procured a policy by examining "who pays the premiums."[23]  The estate argues that the premium-financing structure here—through which the premium payments were funded by a nonrecourse loan to the subtrust, and Berland did not use any of her own assets—reflects that third parties procured the policy.  Lavastone argues that Delaware law permits the use of premium financing to obtain a life-insurance policy, and that the "only relevant question, then, is whether the loan transaction constitutes an unlawful wager under

---

policy with the intent to immediately transfer the policy is not unqualified.  That right is limited to bona fide sales of that policy taken out in good faith.  A bona fide insurance policy sale or assignment requires that the insured take out that policy in good faith—not as a cover for a wagering contract.") (citations omitted); *id.* at 1078 ("[E]ither the individual insured or the trustee must intend to purchase the policy for lawful insurance purposes, and not as a cover for a [wagering] contract").

[22] *See id.* at 1076 ("Payment of the premiums by the insured, as opposed to someone with no insurable interest in the insured's life, provides strong evidence that the transaction is bona fide."); *id.* ("[A]n insured cannot 'procure or effect' a policy without actually paying the premiums."); *id.* ("[I]f a third party funds the premium payments by providing the insured the financial means to purchase the policy then the insured does not procure or [e]ffect the policy."); *id.* at 1078 ("The insured, as settlor or grantor, must both create and initially fund the trust corpus.  This requirement is not satisfied if the trust is created through nominal funding as a mere formality.  If the funding is provided by a third party as part of a pre-negotiated agreement—then the substantive requirements of sections 2704(a) and 2704(c)(5) are not met.").

[23] *Id.* at 1075.

15

the *Price Dawe* factors."[24]  If used to facilitate procurement of a policy for a legitimate insurance purpose, such as estate planning, then premium financing is a recognized and permissible tool.[25]  But the use of such financing might also be evidence of an impermissible STOLI scheme,[26] especially where the use of a nonrecourse loan means that a third party, and not the insured, bears the entire financial liability for obtaining the policy.[27]  The use of a nonrecourse loan to fund the premium therefore is not dispositive, but should be viewed in the context of the entire transaction and in conjunction with consideration of whether the insured intended, when obtaining the policy, "to purchase the policy for lawful insurance purposes, and not as a cover for a [wagering] contract."[28]  If the use of nonrecourse funding allows the insured—individually or as settlor or grantor of a trust—to obtain

---

[24] Opening Brief at 17.  For the statutory provisions governing insurance premium financing, see Title 18, Sections 4801-12 of the Delaware Code.

[25] *See Price Dawe*, 28 A.3d at 1078 ("[E]ither the individual insured or the trustee must intend to purchase the policy for lawful insurance purposes, and not as a cover for a [wagering] contract."). *See generally* Andre S. Blaze & Julian Movsesian, *Consider Premium Financing in Life Insurance Evaluations*, 38 Est. Plan. 30 (2011) (discussing potential uses of premium financing in estate planning).

[26] *See Price Dawe*, 28 A.3d at 1076 ("Payment of the premiums by the insured, as opposed to someone with no insurable interest in the insured's life, provides strong evidence that the transaction is bona fide."); *see also id.* at 1074 ("STOLI schemes are created to feign technical compliance with insurable interest statutes.").

[27] Lavastone's argument that "Delaware law permits an insured to use premium financing to pay policy premium," Opening Brief at 24, glosses over the fact that the use of premium financing does not always result in the insured incurring no expense.  *See* Blaze & Movsesian, *supra* note 25, at 30 (explaining a typical use of a premium financing structure, through which an insured can achieve gift tax savings by "having an irrevocable trust purchase life insurance with borrowed funds and making gifts to the trust that cover only the loan payments, rather than the full premiums on the insurance coverage").

[28] *Price Dawe*, 28 A.3d at 1078.

16

the policy "without actually paying the premiums,"[29] then the requirements of §§ 2704(a) and (c)(5) are not met.

As for the issue of the insured's intent to transfer the policy, the Court in *Price Dawe* held that if a third party financially induces the insured to obtain life insurance with the intent to immediately transfer the policy to a third party, the policy lacks an insurable interest.[30] "Stated differently, if an insured procures a policy as a mere cover for a wager, then the insurable interest requirement is not satisfied."[31] Moreover, a "bona fide insurance policy sale or assignment requires that the insured take out the policy in good faith—not as a cover for a wagering contract."[32]

The same principles apply to the second certified question here. If the insured obtained the policy in good faith—that is for a lawful insurance purpose, rather than as a cover for a wager—then Delaware law does not forbid the transaction, even if the insured did not ever intend to provide insurance protection beyond the contestability period. This might occur if the insured had some *bona fide*, short-term need for insurance such as, for example, ensuring that an estate would have liquidity for an interim period until liquidity would otherwise be achieved from some other

---

[29] *Id.* at 1076.
[30] *Id.* at 1075.
[31] *Id.*
[32] *Id.*

source.[33] But if the insured did *not* procure the policy in good faith—if the transaction is a cover for a wager—then the transaction lacks an insurable interest, whether the insured intended to transfer the policy immediately, as in *Price Dawe*, or after the end of the contestability period.[34]

For these reasons, our answer to the second certified question is No, so long as the use of nonrecourse funding did not allow the insured or his or her trust to obtain the policy "without actually paying the premiums"[35] and the insured or his or her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract.

### D. QUESTION THREE

In the third certified question, the District Court asks: "May an estate profit

---

[33] *See generally* Blaze & Movsesian, *supra* note 25, at 30 (stating that one common element of estate-planning goals is the need for cash liquidity and that "[l]ife insurance is a proven cost-efficient way of providing liquidity to an estate plan").

[34] *Cf. Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 208 A.3d 839, 851-52 (N.J. 2019) ("If the purchaser [with an insurable interest] and investors [without an insurable interest] discussed an arrangement in advance, a third party without an insurable interest may have caused the policy to be procured—even if no firm agreement [for a later sale of the policy] had yet been finalized [at the time that the policy was procured].").  It is also notable that the Delaware Viatical Settlements Act, 18 *Del. C.* § 7501 *et seq.*—to which Lavastone analogizes, but which the parties agree does not apply to the policy at issue in this case, Opening Brief at 19; Answering Brief at 27—limits viatical settlements for *five* years after the policy was issued.  18 *Del. C.* § 7511.  *See also id.* at 7511(a)(3) (prohibiting viatical settlement agreements entered more than two years and less than five years after policy issuance unless, among other things, "[p]olicy premiums have been funded exclusively with unencumbered assets . . . provided by, or fully recourse liability incurred by, the insured").  *Cf. also Sun Life v. Wells Fargo*, 208 A.3d at 853 ("Two model acts have been designed to stop STOLIs.  One bars any person from entering into any practice or plan which involves STOLIs.  The other generally bars viatical settlement agreements for five years, instead of two." (cleaned up)).

[35] *Price Dawe*, 28 A.3d at 1076.

18

under 18 *Del. C.* § 2704(b) if an insurance policy in violation of 18 *Del. C.* § 2704(a) was procured in part by fraud on the part of the decedent and the decedent profited from the previous sale of the policy?"

The only potential fraud identified by the District Court in its statement of the undisputed facts is that "[i]ncluded with" the Berland life-insurance application "was a form that falsely stated that she had $10 million in assets and $180,000 in annual income."[36] Notably, the District Court's statement of the undisputed facts does not indicate that Berland was aware that her income and assets were misstated—a fact that the parties dispute—or conclude that Berland committed fraud in procuring the policy at issue. But the District Court's framing of the certified question assumes that the insured did commit fraud in procuring the policy, and this analysis therefore proceeds from that premise.

Lavastone argues that an estate should not be permitted to recover under § 2704(b) if the decedent committed fraud in procuring the policy because "an insured's estate is bound by her fraudulent and tortious conduct"[37] and "Delaware law does not permit an insured's estate to profit from misconduct that would have barred the decedent from recovering."[38] § 2704(b), however, expressly provides that an estate may maintain an action to recover death benefits paid on a life-insurance

---

[36] Certification of Questions of Law, at 2.
[37] Opening Brief at 42.
[38] *Id.*

policy that was procured in violation of the insurable-interest requirement. Lavastone has not cited any authority involving fraud as a bar to such a statutorily-created remedy.

Moreover, it does not appear likely, based on the facts as stated by the District Court, that Lavastone would be able to establish that it was a victim of the fraud.[39] It is not clear what knowledge Lavastone had regarding Berland's statement of her income and assets. But it does not appear likely that Berland made any statement of her income and assets *to Lavastone*. It appears that any such statement was made to Lincoln. Nor does it appear likely that Berland intended *Lavastone* to believe the statement or to act in reliance on it; nor that Lavastone in fact believed or acted on the representation regarding Berland's income and assets. Indeed, given that the contestability period expired long ago, even Lincoln, the insurer to whom the statements of Berland's income and assets were made, would be unable, it would appear, to contest the policy solely on the basis of those statements.[40] It makes little sense for Lavastone to be able to defeat a statutorily-created remedy on the basis of misstatements that would not afford relief to even the insurer, the actual "victim" of

---

[39] *See Twin Coach Co v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 284 (Del. Super. Ct. 1960) ("To begin with, in every action of fraud there must be a deceiver and his victim. (1) The deceiver must make a false representation of a material fact to the victim. (2) The deceiver must have had knowledge of the falsity of his representation, while his victim must have been ignorant thereof. (3) The representation must have been made with the threefold intent that the victim believe it to be true, act in reliance thereon, and be deceived thereby. (4) The victim must have so believed, acted, and been deceived, as well as having been damaged thereby.").
[40] 18 *Del. C.* § 2908.

20

the misstatements.

Lavastone's arguments that the estate's claim is barred by the doctrines of *in pari delicto* and unclean hands fail for similar reasons. To the extent that both Berland and Lavastone were engaged in a STOLI scheme, the General Assembly has prescribed that the estate should receive the proceeds of the policy as a matter of public policy. Thus, these equitable principles do not apply.[41]

Our answer to the fraud portion of Question Three, therefore, is that fraud in the insurance application regarding an insured-decedent's income and assets does not bar an estate's claim under § 2704(b) if the recipient of the death benefits cannot establish that it was a victim of the fraud.

Lavastone also contends that the decedent's intentional and voluntary sale of a life-insurance policy, at a profit, bars an estate's claim under Section 2704(b) because "an estate stands in the shoes of its decedent and is bound by the decedent's contracts and conduct."[42] However, a decedent-insured's mere sale of the policy at

---

[41] *See generally Seacord v. Seacord*, 139 A. 80, 81 (Del. Super. Ct. 1927) ("The equitable maxim that he who comes into equity must come with clean hands is subject to well-defined limitations. While the general rule is that where the parties are in pari delicto, no affirmative relief of any kind will be given to one against the other, that rule has always been regarded by courts of equity as without controlling force in all cases in which public policy is considered as advanced by allowing either party to sue for relief against the transaction.").

[42] Opening Brief at 35. Lavastone also argues that a provision of the Uniform Commercial Code, 6 *Del. C.* § 8-502, bars the estate's claim to the death benefits. This issue is beyond the scope of the certified questions in this case, but it is squarely raised in the certified questions presented in *Wells Fargo Bank, N.A. v. Estate of Malkin*, 172, 2021, which is currently pending before the Court. Oral argument has not yet been scheduled in *Malkin*.

a profit does not bar an estate's claim under Section 2704(b). The insured typically receives consideration for her participation in the procurement of a policy that lacks an insurable interest,[43] and thus something more must be required to bar an estate's claim. Accordingly, the decedent's sale of the policy for profit, without more, does not bar an action by the estate under § 2704(b).[44]

## CONCLUSION

The Clerk of the Court is directed to transmit this opinion to the District Court.

---

[43] *See, e.g.*, *Price Dawe*, 28 A.3d at 1063 (stating that insurance company alleged that Dawe was "financially induced into participating in the transaction"). *See also, e.g.*, *Ohio Nat'l Life Assurance Corp. v. Davis*, 803 F.3d 904, 908 (7th Cir. 2015) ("The insureds merely lent their names to the insurance applications, in exchange for modest compensation . . . ."); *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 208 A.3d 839, 848 (N.J. 2019) ("In a traditional life settlement, investors purchase existing life insurance policies from insureds who no longer need the insurance to protect their families in the event of their deaths. In a STOLI arrangement, by contrast, a life settlement broker persuades a senior citizen to take out a life insurance policy—not to protect the person's family but for a cash payment or some other current benefit arranged with a life settlement company." (cleaned up)); *Gilbert v. Moose*, 104 Pa. 74, 77 (Pa. 1883) (discussing consideration paid for assignment of policy lacking insurable interest).

[44] Lavastone also contends that, when selling the policy, Berland executed documents that "waive[d] the exact claims brought by her Estate in this case." Opening Brief at 36. Neither the undisputed facts nor the certified questions contained in the District Court's Certification of Questions of Law make any mention of a waiver issue. We, therefore, consider it to be outside the certified questions and, for that reason, we do not address it.