# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| CoVenture – Burt Credit Opportunities GP, LLC, a Delaware Limited Liability Company,<br><br>  Plaintiff,<br><br>  v.<br><br>Joshua William Coleman, *et al.*,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. N22C-07-197 MMJ CCLD<br>)<br>)<br>)<br>)<br>) |

Submitted: August 2, 2023
Decided: November 1, 2023

On Defendant Joshua Coleman's Motion to Dismiss Plaintiff's Amended Complaint
**GRANTED IN PART AND DENIED IN PART**

## OPINION

Lisa Zwally Brown, Esq., Samuel L. Moultrie, Esq., Greenberg Traurig, LLP, Wilmington, DE, Gabriel Aizenberg, Esq. (*pro hac vice*) (Argued), Scott Mendeloff, Esq. (*pro hac vice*), Aaron S. Klein, Esq. (*pro hac vice*), Greenberg Traurig, LLP, Chicago, IL, *Attorneys for Plaintiff*

Richard I.G. Jones, Jr., Esq. (Argued), Michael W. McDermott, Esq., Berger Harris LLP, Wilmington, DE, Steven R. Campbell, Esq. (*pro hac vice*), Scott M. O'Brien, Esq. (*pro hac vice*), Alston & Bird LLP, New York, NY, *Attorneys for Defendant*

1

**JOHNSTON, J.**

## FACTUAL AND PROCEDURAL CONTEXT

This contract dispute arises from a lending relationship between CoVenture – Burt Credit Opportunities GP, LLC ("CoVenture") and Sterling Risk Holdings, LLC ("Sterling Risk"), Burtonvic Capital and a variety of Burtonvic Capital subsidiaries ("Burtonvic Entities").[1]

CoVenture was the agent for a group of lenders, and Burtonvic Capital and its direct and indirect subsidiaries, including Sterling Risk.[2] CoVenture alleges that Burtonvic Capital and its subsidiaries are all controlled by Joshua Coleman ("Coleman") and owned by trusts in the name of his wife, Jenna K. Coleman.[3] CoVenture contends that Coleman caused the Burtonvic Entities to enter into the lending relationship, and made representations and promises that Coleman knew or had reason to know were false and fraudulent.[4]

Burtonvic Capital, through its subsidiary Sterling Risk and with other Burtonvic Capital subsidiaries, entered into a Financing Agreement with CoVenture to obtain approximately $50,000,000 of delayed draw term loans on a senior secured basis.[5] CoVenture alleges that the sole permitted use of proceeds funded under the

---

[1] Pl. Answering Br. in Opp. to Def.'s Mot. to Dismiss 3.
[2] Am. Compl. at ¶ 1.
[3] *Id.*
[4] *Id.*
[5] *Id.* at ¶ 2.

Financing Agreement was to be able to purchase seven insurance brokerage firms.[6]

Under the Financial Agreement, Sterling Risk was the actual borrower, and the other entities and trust businesses associated with Coleman are guarantors of the loans pursuant to Security, Guaranty, and Limited Guaranty Pledge Agreements.[7]

CoVenture alleges that Sterling Risk defaulted on multiple provisions of the Financing Agreement, including the failure to pay interest when due.[8] CoVenture also contends that Coleman, Burtonvic Capital, Sterling Risk and the other guarantors have failed to pay back an amount exceeding $57,000,000 owed under the parties' various loan, security, and guarantee agreements.[9]

CoVenture asserts that Coleman knowingly, intentionally, and in reckless disregard of the truth defrauded CoVenture in an amount in excess of $50,000,000 by making numerous false and fraudulent statements and omissions, representations, and documents over an extended period.[10] Coleman, Sterling Risk, and Burtonvic Capital deceived CoVenture into transferring $50,000,000 to Sterling Risk and Burtonvic Capital through the following schemes: (a) Coleman fraudulently diverted CoVenture's loans for purposes other than the purchase of the specified insurance brokerage firms and concealed those actions from CoVenture with additional false

---

[6] *Id.* at ¶¶ 2–3.
[7] *Id.*
[8] *Id.* at ¶ 4.
[9] *Id.*
[10] *Id.* at ¶ 5.

statements; and (b) the Collateral (as defined in the Security Agreement) used to secure the various loans was encumbered because Coleman defrauded CoVenture of the security underlying their loans by pledging and/or diverting the Collateral as security for various different business transactions including many for Coleman's personal benefit, which dissipated the Collateral.[11]

CoVenture claims that between December 1, 2021 and June 7, 2022, Coleman leveraged his control of Burtonvic Capital, Sterling Risk, and various other Guarantors/Grantors to enter into no fewer than thirty-three merchant cash advance agreements, allowing Coleman to transfer the accounts receivable of the contracting companies to other third parties in exchange for cash advances.[12] Coleman then used the cash to advance his fraudulent scheme and to cause CoVenture further damage by impairing CoVenture's interest in the agreed Collateral.[13] CoVenture alleges that Coleman also sold and/or diverted away other Collateral to various Burtonvic Entities as security for these loans.[14] Finally, CoVenture alleges that Coleman, whether acting individually or in his own capacity as manager, did everything for his own personal gain.[15]

---

[11] *Id.*
[12] *Id.* at ¶ 7.
[13] *Id.*
[14] *Id.* at ¶ 8.
[15] *Id.* at ¶ 19.

CoVenture filed its initial Complaint on July 29, 2022, bringing claims against Coleman, Sterling Risk, Burtonvic Capital, and Burtonvic Entities.[16] On November 28, 2022, Coleman moved to dismiss the initial Complaint.[17] In December 2022, all of the initially-named defendants that were party to the Financing Agreement except for three (Jenna K. Coleman Revocable Trust, Jenna K. Coleman Dynasty Trust, and SEK Holding Co. LLC) stipulated to judgment in the amount of $58,987,305.23, representing the principal loan amount plus interest.[18] On January 27, 2023, CoVenture filed its First Amended Complaint ("FAC").[19]

CoVenture's FAC contains two counts: Count I for Breach of the Financing Agreement against only the Revocable Trust, Dynasty Trust, and SEK; and Count II for Fraud against only Coleman.[20]

A Stipulated Judgment for Count I was entered on December 2022. Count II—Fraud against Coleman—remains before this Court.

Count II is further separated into four categories: Fraud in the inducement ("Fraud I"); False representations re: use of loan proceeds ("Fraud II"); False agreement re: Strata Energy ("Fraud III"); and False representations re: collateral free of liens ("Fraud IV").[21]

---

[16] Def.'s Opening Br. in Supp. of Mot. to Dismiss 3.
[17] *Id.* at 2.
[18] *Id.*
[19] *Id.*
[20] Pl.'s Answering Br. in Opp. to Def.'s Mot. to Dismiss 3.
[21] Def.'s Opening Br. in Supp. of Mot. to Dismiss 4–6.

Defendant Coleman has moved to dismiss CoVenture's Amended Complaint.

## MOTION TO DISMISS STANDARD

In a Rule 12(b)(6) Motion to Dismiss, the Court must determine whether the claimant "may recover under any reasonably conceivable set of circumstances susceptible of proof."[22] The Court must accept as true all well-pled allegations.[23] Every reasonable factual inference will be drawn in the non-moving party's favor.[24] If the claimant may recover under that standard of review, the Court must deny the Motion to Dismiss.[25]

## ANALYSIS

### *Fraud Allegations*
### *(Count II Fraud)*

CoVenture alleges in their Answering Brief four different fraud claims against Coleman.

First, CoVenture asserts "a fraud in the inducement claim alleging that prior to executing the Agreement, Coleman falsely represented that two liens had been terminated and provided sham lien termination documents in order to induce Plaintiff to *enter* into the Financial Agreement and other Agreements."[26]

---

[22] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).
[23] *Id.*
[24] *Wilmington Sav. Fund. Soc'v, F.S.B. v. Anderson*, 2009 WL 597268, at *2 (Del. Super.) (citing *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005)).
[25] *Spence*, 396 A.2d at 968.
[26] Pl.'s Answering Br. in Opp. to Def.'s Mot. to Dismiss 4.

Second, CoVenture alleges that during the lending relationship, Coleman made false representations and fabricated documents asserting that the proceeds of the loans would be and were used to purchase insurance brokerage firms in the name of and as collateral for Sterling Risk. The firms included Mappus Insurance Agency, Inc., Crescent Insurance Advisors, LLC, The Insurance Alliance, LLC, Madison Consulting Group, LLC, Florida Strategic Insurance, LLC, and Peninsula Group d/b/a/ Costal Living Consultants. The purpose of Coleman's fraudulent behavior was to induce Plaintiff to lend and to conceal the fact that he was defrauding Plaintiff of its funds and rightful collateral.[27]

Third, CoVenture contends that "Coleman fraudulently deceived Plaintiff to consent to Strata Energy's sale of oil and gas assets by providing Plaintiff with a false agreement, failing to disclose the existence of a genuine agreement that was executed prior thereto, and making other false representations . . . In short, Coleman fraudulently caused the sale of Strata Energy's assets by using a consent that Coleman wrongfully obtained, which should have been subject to a mandatory prepayment, and further fraudulently used those proceeds for his own personal benefit."[28]

---

[27] *Id.*
[28] *Id.*

7

Fourth, CoVenture alleges that "Coleman falsely and fraudulently made certifications that the Collateral for the various loans was free and clear of any liens and that no Grantor (various Burtonvic Capital entities that were guarantors of the loans from Plaintiffs) would take any interest to impair the Collateral . . . Despite these certifications, Coleman fraudulently caused the Grantors to enter into various merchant cash advance (factoring) agreements, which providing the contracting parties with access to and security interests in substantial portions of the collateral that Coleman had caused the Guarantors to pledge exclusively to Plaintiff. Thus, as a result of this fraudulent conduct, Coleman intentionally alienated and impaired Plaintiff's security interests in the Collateral."[29]

**A. CoVenture's Fraud Claims Against Coleman**

CoVenture alleges that their fraud claims against Coleman and Burtonvic Capital began at the outset of the corporate relationship.[30] In October 2021, CoVenture sought proof from Coleman and Burtonvic of the termination of two liens against Burtonvic Capital's membership interest in two of its subsidiaries and two of Burtonvic Capital's deposit accounts.[31] This was a required step before closing on the Financing Agreement transaction.[32] CoVenture alleges that Coleman caused

---

[29] *Id.*
[30] Pl.'s Am. Compl. ¶ 89.
[31] *Id.* at ¶ 90.
[32] *Id.*

8

Burtonvic Capital to agree under the Financing Agreement to provide evidence of the termination of the two liens, since CoVenture would not have entered into the Financing Agreement or provided any loans otherwise.[33]

Additionally, Coleman caused Burtonvic Capital to provide to CoVenture two UCC-3 termination statements which provided evidence of the release of each of the two liens on the collateral.[34] CoVenture alleges that in July 2022, CoVenture discovered that the two UCC-3 termination statements were false and fabricated.[35] CoVenture confirmed with the Secretary of State for the State of Delaware that the termination statements were invalid.[36]

CoVenture contends that beginning in June 2022, CoVenture received information that Coleman and others had been engaging in a scheme to use Burtonvic Capital, Sterling Risk and other Burtonvic Entities to defraud CoVenture.[37] Coleman knowingly, intentionally and recklessly deceived CoVenture into permitting and funding millions of dollars of loans to Sterling Risk under the Financing Agreement and the other Agreements by providing false and fraudulent statements, representations and information all with material omissions.[38]

---

[33] *Id.*
[34] *Id.* at ¶ 91.
[35] *Id.*
[36] *Id.*
[37] *Id.* at ¶ 92.
[38] *Id.*

9

CoVenture asserts that Coleman stated that Sterling Risk would use loans obtained under the Financing Agreement to purchase certain insurance brokerage entities.[39] Coleman knew and had reason to know that Sterling Risk obtained those loans, but did not actually acquire the entities.[40]

In summary, CoVenture alleges that Coleman and Sterling Risk made false and fraudulent statements, representations, information, and material omissions to CoVenture by:

    a. false and fraudulent Notices of Borrowing;

    b. false and fraudulent asset purchase agreements; and

    c. false and manufactured bank records that fraudulently misrepresented that Sterling Risk had transferred and caused to be transferred funds to purchase insurance brokerage firms, when Sterling Risk had neither transferred the funds nor purchased the firms.[41]

Additionally, CoVenture alleges that Coleman and Sterling Risk schemed to conceal their plans from CoVenture by providing:

---

[39] *Id.* at ¶ 93.
[40] *Id.*
[41] *Id.* at ¶ 94.

a. false and manufactured financial information and projections that fraudulently misrepresented that Sterling Risk had acquired various insurance brokerages when it had not; and

b. a false and manufactured Certificate of Compliance purporting to contain certain financial information regarding Sterling Risk and its subsidiaries, including leverage ratios and revenue growth that fraudulently and misleadingly misrepresented that Sterling Risk had acquired various insurance brokerages when in truth it had not.[42]

CoVenture identifies six allegedly fraudulent loans: (1) Mappus Loan, (2) Crescent Loan, (3) TIA Loan, (4) MCG Loan, (5) FSI Loan, and (6) Coastal Loan.

*(1) Mappus Loan*

CoVenture loaned $6,600,000 to Sterling Risk, which was wired to Burtonvic Capital.[43] CoVenture decided to provide this loan based on the representation that Coleman provided a side letter dated September 21, 2021, which named Sterling Risk as the buyer of Mappus.[44] CoVenture alleges that the side letter was a complete fabrication, and Coleman knew that the side letter was deceitful.[45] Coleman only offered the letter in order to obtain a loan for Mappus.[46]

---

[42] *Id.* at ¶ 95.
[43] *Id.* at ¶ 96.
[44] *Id.* at ¶ 97.
[45] *Id.* at ¶ 100.
[46] *Id.*

*(2)–(4) Crescent, TIA, and MCG Loan*

On December 20, 2021, Coleman and Sterling Risk allegedly provided a false and fraudulent Notice of Borrowing to CoVenture, requesting a loan to purchase Crescent, TIA, and MCG.[47] CoVenture alleges that Coleman and Sterling Risk submitted a false and fraudulent Asset Purchase Agreement purporting the acquisition of MCG on December 17, 2021.[48] CoVenture alleges the December 20, 2021 Notice of Borrowing contains payment instructions to wire the funds to Burtonvic Capital, not Sterling Risk, in a bank account held at Citibank.[49] CoVenture wired $8,365,850.67 to Burtonvic Capital on or about December 20, 2021 for the purpose of allowing Coleman to acquire MCG.[50] Coleman represented to CoVenture that Sterling Risk had an agreement to purchase MCG from MCG shareholders Jorge Valentine and Matthew Laurance for $7,004,531.[51] CoVenture also alleges that Coleman provided false and fraudulent financial information stating that Sterling Risk had purchased MCG and that MCG was a subsidiary of Sterling Risk.[52] Coleman lied about Sterling Risk purchasing MCG because MCG was never purchased by Sterling Risk, Burtonvic Capital, or Coleman.[53]

---

[47] *Id.* at ¶ 102.
[48] *Id.* at ¶ 106.
[49] *Id.* at ¶ 107.
[50] *Id.* at ¶ 108.
[51] *Id.* at ¶ 109.
[52] *Id.* at ¶ 110.
[53] *Id.* at ¶¶ 114–117.

*(5) FSI Loan*

On December 23, 2021, Coleman allegedly provided a false and fraudulent Notice of Borrowing to request a loan to finance the purchase of FSI.[54] On December 24, 2021, Coleman provided CoVenture a copy of a false and fraudulent Asset Purchase Agreement.[55] It appeared that Sterling Risk had agreed to purchase FSI from shareholders David Rano, Michael Puffer, and Christopher Weaver for the purchase price of $16,557,740.84.[56] CoVenture alleges that Coleman fraudulently provided CoVenture a December 2021 Citibank Statement that showed Burtonvic Capital sent three separate wire transfers, each totaling $5,519,246.95, to David Rano, Michael Puffer, and Christopher Weaver for the purchase of FSI.[57] Coleman, Sterling Risk, Burtonvic Capital, and Burtonvic Entity did not pay anything to David Reno, Michael Puffer, or Christopher Weaver, and FSI was never purchased.[58] CoVenture further alleges that on February 8, 2022, Coleman submitted to CoVenture a false December 2021 Certificate of Compliance containing financial information regarding Sterling Risk and its subsidiaries to conceal Coleman's scheme to defraud and to lull CoVenture into a false sense of security on their investment.[59]

---

[54] *Id.* at ¶ 126.
[55] *Id.* at ¶ 131.
[56] *Id.*
[57] *Id.* at ¶ 133.
[58] *Id.* at ¶ 134.
[59] *Id.* at ¶ 139.

*(6) Coastal Loan*

On February 11, 2022, Coleman allegedly caused Sterling Risk to serve a false and fraudulent Notice of Borrowing to CoVenture to request a loan to purchase Coastal.[60] In reliance of the false and fraudulent February 11, 2022 Notice of Borrowing, CoVenture wired $11,108,100.20 to Burtonvic Capital to purchase Coastal.[61]

CoVenture alleges that all six loans were part of Coleman's cash advance scheme.[62] Coleman would provide false and fraudulent Notice of Borrowings to CoVenture that certified: (i) the Grantor's Collateral was free and clear of any Liens; and (ii) CoVenture had a first priority security interest.[63] CoVenture alleges that Coleman lied to CoVenture and begun his fraudulent merchant cash advance scheme which encumbered the Collateral and caused the various Grantors, including Burtonvic Capital, Sterling Risk, and Strata Holdings, to enter into no less than three merchant cash advance agreements, pledging a first priority lien and security interest worth at least $2,137,275 in these Grantors' Collateral in exchange for at least $2,250,000 of cash.[64]

---

[60] *Id.* at ¶ 145.
[61] *Id.* at ¶ 149.
[62] *Id.* at ¶¶ 123–148.
[63] *Id.* at ¶ 147.
[64] *Id.* at ¶ 148.

14

CoVenture alleges that Coleman fraudulently concealed the existence of Strata Energy, a wholly owned subsidiary of Burtonvic Capital.[65] CoVenture and Coleman, soon after becoming aware of Strata Energy, negotiated a Joinder Agreement and a First Amendment to the Financing Agreement to join Strata Energy and Vesta Biomass as Additional Guarantors.[66] CoVenture alleges that the purpose of the First Amendment to the Financing Agreement was to permit Strata Energy to sell its assets and reinvest the proceeds back in the business of Sterling Risk.[67] Coleman delivered to CoVenture a fraudulent Strata Sale Agreement on February 22, 2022 because Strata Energy had already agreed to a Purchase and Sale Agreement with Perdido Southeast, LLC ("Perdido").[68] CoVenture alleges that Coleman fraudulently obtained CoVenture's consent to the sale of Strata's assets because the False Strata Agreement provided by Coleman was not the actual agreement between Strata Energy and Perdido.[69] Coleman also engaged in other false and fraudulent misrepresentations, deceptions, and material omissions.[70] CoVenture's consent of the sale of Strata Energy's assets to Perdidio allowed

---

[65] *Id.* at ¶¶ 151–152.
[66] *Id.* at ¶ 152.
[67] *Id.* at ¶ 153.
[68] *Id.* at ¶¶ 154–155.
[69] *Id.* at ¶ 160.
[70] *Id.*

Coleman to provide the proceeds of the sale ($6,000,000) to his personal creditor, SIP CAG Feeder GP, LLC ("SIP CAG"), for his own personal benefit.[71]

Between December 1, 2021 and June 6, 2022, Coleman leveraged his control over various Grantors to enter into thirty-three merchant cash advance ("MCA") agreements, by which Coleman caused the accounts receivables of the various Grantors to be transferred to the counterparties in the MCA agreements.[72] CoVenture alleges that Coleman knew that Grantors had already been pledged as Collateral to CoVenture for the Secured Obligations under the October 22, 2021 Security Agreement.[73] Coleman was still able to receive cash advances totaling over $43,000,000.[74] CoVenture alleges that Coleman took part of this merchant cash advance scheme to obtain cash from the Grantors for his personal benefit, to further induce CoVenture to loan additional funds, and to conceal Coleman's scheme to defraud CoVenture.[75]

### B. Tort Claims Must Involve Violation of Duties Apart from Breach of Contract

This Court stated in *Cornell Glasgow, LLC v. La Grange Properties, LLC*:

> The motions *sub judice* present themes that are quite common in commercial litigation arising from the breakdown of a contractual relationship. It seems more and more that breach of

---

[71] *Id.* at ¶ 166–169.
[72] *Id.* at ¶ 172.
[73] *Id.*
[74] *Id.*
[75] *Id.* at ¶ 173.

16

contract claims will not suffice to ameliorate the sense of betrayal parties feel when they come out on the losing end of a contractual business relationship. Often parties feel compelled to punctuate their breach claims with claims that the breaching party committed fraud, either by inducing performance without any intention of reciprocating, or by misrepresenting facts or circumstances relating to the performance of the contract in advance of or in connection with the alleged breach. The aggrieved party seeks tort damages, usually including exemplary damages, in addition to breach damages. A claim for extra-contractual attorney's fees will typically be thrown in for good measure.

In some instances, the tort claims are justified when facts and circumstances reveal that something more than failed performance was responsible for the breakdown of the contractual relationship. In other instances, the tort claims amount to nothing more than an effort to "pile on" diaphanous claims of misbehavior on top of contractual breach claims that alone are adequate to redress the "wrong" that allegedly has been committed. Much like the brawler who brings a big stick to a fist fight, these parties seek to escalate the controversy by injecting tort claims into straightforward breach of contract disputes.[76]

Coleman argues that CoVenture's fraud claims arise from and overlap with CoVenture's breach of contract claim. Further, CoVenture already has secured a judgment for all damages to which CoVenture is entitled.[77]

In *AFH Holding Advisory, LLC v. Emmaus Life Sciences, Inc.*, this Court ruled that tort claims must involve violation of duties apart from contractual obligations.

Tort claims must involve violation of a duty arising apart from the contractual agreement. To survive as a separate claim, a fraud claim must be collateral to the breach of contract claims. The

---

[76] 2012 WL 2106945, at *1 (Del. Super.).
[77] Def.'s Opening Br. in Supp. of Mot. to Dismiss 12.

party asserting fraud must plead damages separate and apart from the alleged damages for breach of contract. The fraud damages must be more than a "rehash" of the contract damages. . . .The Court finds that [Plaintiff's] breach of contract claims and fraud claims are based on the same operative facts. Additionally, [Plaintiff] has not demonstrated a *prima facie* basis for damages for fraud or fraud in the inducement, separate and apart from any compensatory damages or declaratory relief to which [Plaintiff] may be entitled for breach of contract or unjust enrichment.[78]

Thus, this Court has held that if the contract and fraud claims are based on the same operative facts, a plaintiff is not entitled to compensatory damages on fraud or fraud in the inducement.

The Court of Chancery also provides guidance as to permissible exceptions to the rule against "bootstrapping" fraud onto breach of contract claims.

To be sure, a plaintiff can avoid the anti-bootstrapping rule by pleading facts in support of a fraud claim that have nothing to do with the facts pled in support of a separately alleged breach of contract. That proposition, I think, is self-evident. But a plaintiff can also plead a fraud claim that is not the product of improper bootstrapping by alleging facts that support an inference that the defendant knowingly made false representations in a contract on which the plaintiff justifiably relied, and then breached that contract by violating the representation(s) that were falsely made. That scenario, if well pled, supports at least two viable claims—fraud *and* breach of contract.

In my view, the anti-bootstrapping rule bars a fraud claim where the plaintiff merely "adds the term 'fraudulently induced' to a complaint or alleges that the defendant never intended to comply with the agreement at issue at the time the parties entered into it," but it does not prevent a fraud claim against defendants who "knew [contractual representations] were false, and yet made

---

[78] 2013 WL 2149993, at *13 (Del. Super.).

18

them anyway." A rule that would limit a plaintiff's recovery for so-called "contractual fraud" solely on the ground that the same conduct also constitutes a breach of contract would offend Delaware public policy and the now-settled Delaware law regarding "contractual fraud" that is animated, in part, by those policy concerns.

Thus, the anti-bootstrapping rule does not prevent parties from bringing a fraud claim if (1) the plaintiff alleges the seller knowingly made false contractual representations, (2) "damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim," (3) "the conduct occurs prior to the execution of the contract 'and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction,'" or (4) "the breach of contract claim is not well-pled such that there is no breach claim on which to 'bootstrap' the fraud claim."[79]

CoVenture has alleged in the Amended Complaint that Coleman provided false documentation, knowing that Coleman was using CoVenture to further his cash advance scheme instead of abiding by his contractual responsibilities to CoVenture.[80] Coleman argues that CoVenture fails to state a fraud claim because CoVenture's fraud claim and alleged damages are identical to those sought for breach of contract."[81]

Delaware courts have held that corporate officials may be held individually liable for tortious conduct.

---

[79] *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *7–8 (Del. Ch.)(internal citations omitted).
[80] Pl.'s Am. Compl. ¶ 173.
[81] Def.'s Opening Br. in Supp. of Mot. to Dismiss; Def.'s Reply Br. in Supp. of Mot. to Dismiss.

> [E]xecutives, directors and officers of an entity can be held *individually* liable for the fraudulent or tortious acts which they, in their official capacities, commit, ratify or approve, despite the fact that they may have acted as an agent for or performed for the benefit of that entity at the time the fraudulent or tortious act was committed, ratified or approved.[82]

LLC managers also may be individually liable for their tortious conduct.[83] Therefore, there is no need to address piercing the corporate veil or any alter ego theory.

It is unclear to the Court what status Coleman holds within any entity—whether he is a manager, an executive, a director, or an officer. CoVenture has admitted that "Coleman was not party to the relevant Agreements."[84] Neither CoVenture nor the Defendant has clarified Coleman's position or status in any of the entities involved in this lawsuit. Nevertheless, the Court finds that CoVenture can bring fraud claims against LLC managers, executives, directors and officers.

---

[82] *AFH Holding*, 2013 WL 2149993 at *11 (emphasis in original); *see also Duffield Assocs., Inc. v. Meridian Architects & Engineers, LLC*, 2010 WL 2802409, at *4 (Del. Super.) (citing *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) ("[A] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort.")).

[83] *See Doe v. Bicking*, 2020 WL 374677, at n.18 (Del. Super.) (citing *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n.22 (Del. Ch.)) ("I see no reason why the rule would be any different for a member of an LLC who has management rights."); *see also MacFadyen, LLC v. Scotto's Pastabilities, II, Inc.*, 2015 WL 4400036, at *3 (Del. Super.) (The court declined to dismiss the tort claims against an LLC manager, relying on the principle that corporate officials may be held liable for their tortious conduct).

[84] Pl.'s Answering Br. in Opp. to Def.'s Mot. to Dismiss 7.

These individuals are not immune from personal liability if found to have engaged in fraudulent conduct.

Discovery and the relevant facts are not the same when evaluating fraud as opposed to fraud in the inducement. For fraud in the inducement, generally, the only relevant facts occurred prior to the time the contract was signed. Breaches of contract involve events that happened while the contract was in place.

CoVenture's fraud allegations relate to failed performance under the Financing Agreement and are not collateral to the Financing Agreement. The relevant facts do not involve violations of duties arising by operation of law, as opposed to duties imposed by the actual agreement of the parties.

This Court has made clear in *Cornell Glasgow*:

> Clearly, the alleged misrepresentations and/or omissions upon which Cornell relies to make its fraud claim "were not collateral to the [Development Agreement], but rather memorialized [ ] some of [La Grange's] principal obligations under [the] agreement with [Cornell]." As such, even if the defendants never intended to perform, their alleged scheme to breach the Development Agreement simply cannot give rise to an actionable claim for fraud or negligent misrepresentation. At best, Cornell has plead that defendants (La Grange in particular) engaged in an "efficient breach" of the contract for which it can be held liable for compensatory and expectancy damages.[85]

The Court finds that CoVenture's fraud claims (as distinguished from fraud in the inducement) are a "rehash" of CoVenture's breach of contract claim.

---

[85] 2012 WL 2106945, at *8 (internal citations omitted).

CoVenture's tort claims for fraud cannot survive alongside the breach of contract claim.

### *Damages – Fraud or Breach of Contract*

Fraud damages alleged must be different from breach of contract damages.

> Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action. The damages allegations, however, may not simply rehash the damages allegedly caused by breach of contract. . . .[A] claim for rescission or rescissory damages separates a fraudulent inducement claim from breach-of-contract damages. Nonetheless, if discovery demonstrates that [Plaintiff's] damage claims for breach of contract and fraud are the same, the Court can revisit the issue prior to trial. A fraud claim can be based on representations found in a contract. But the allegations of fraud must be separate from the breach-of-contract claim. And "[a]llegations that are focused on *inducement* to contract are 'separate and distinct' conduct.[86]

Plaintiffs must delineate damages specific to fraud.

> [F]raud damages allegations can't simply "rehash" the damages that were allegedly caused by the claimed breach of contract." . . . .This Court consistently has held that the "mere addition of punitive damages to [plaintiff's] fraudulent inducement charge is not enough to distinguish it from the contract damages." "Failure to plead separate damages is an independent ground for dismissal.[87]

---

[86] *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at \*18 (Del. Ch.) (internal citations omitted); *see also Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at \*16 (Del. Ch.) ("Stated differently, a plaintiff cannot state a claim for fraud simply by adding the term 'fraudulently induced' to a complaint that states a claim for breach of contract, or by alleging that the defendant never intended to abide by the agreement at issue when the parties entered into it.").

[87] *Firmenich, Inc. v. Nat. Flavors, Inc.*, 2019 WL 6522055, at \*5–6 (Del. Super.) (internal citations omitted).

In *Kainos Evolve, Inc. v. InTouch Technologies, Inc.*,[88] the Court of Chancery held that the fraud claim "may survive only if the fraud claim is based on conduct that is separate and distinct from the conduct constituting the breach." However, the Court of Chancery found that it would have been premature to dismiss the fraud claim if the "measure of damages for the fraud claim would be different" from the breach of contract damages.[89] Under such circumstances, breach of contract and fraud claims may proceed on parallel tracks as alternative theories of recovery.[90]

This case is somewhat unique. A Stipulated Judgement already has been entered against other defendants. The parties consented to the Judgement on the basis that the agreement exists and is enforceable.

Ordinarily, plaintiffs seek rescissory damages for fraud in the inducement.[91] The contract is deemed rescinded. If the damages can be measured, rescissory

---

[88] 2019 WL 7373796 (Del. Ch.).

[89] *Id.* at *3.

[90] *CLP Toxicology*, 2020 WL 3564622, at *21; *see also Brevet Cap. Special Opportunities Fund, LP v. Fourth Third, LLC*, 2011 WL 3452821, at *6–7 (Del. Super.) (In order to plead simultaneous breach of contract and fraud claims, "arising from the same transaction or series of transactions, the alleged misrepresentation(s) must involve either a past or contemporaneous fact or a future event that falsely implies an existing fact.") (internal citations omitted).

[91] *Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307 at *14 (Del. Super.); *see ITW Glob. Invest. Inc.,* 2015 WL 3970908, at *6 (Del. Super.) ("Count I for fraud must be dismissed because it pleads damages that are simply a "rehash" of the breach of contract damages. Because Count II for fraud in the inducement pleads damages for rescission or rescissory damages, the Court will not address Count II."); *see also EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 (Del. Super.) (finding that plaintiff's count for fraud in the inducement is materially identical to the breach of contract complaint and rejecting plaintiff's reliance on *ITW* because plaintiff seeks neither rescission nor rescissory damages).

damages will be awarded. This case is not a dispute about, for example, an asset purchase agreement where it would be difficult or impossible to "unscramble the eggs."[92] The damages appear to be duplicative of those set forth in the Stipulated Judgment, which included the principle amount due, interest accrued, and penalties applied.

CoVenture may find it problematic, if not impossible, to collect on the Stipulated Judgment, which is dependent upon a valid agreement, and at the same time assert entitlement to rescissory damages. Such damages require proof that the agreement was void *ab initio*. In order to receive rescissory damages, the claimant normally must seek actual recission.[93]

The Delaware Court of Chancery also noted in *Levy Family*:

> Additionally, as noted, fraud claims that assert damages that are distinct from breach damages are not duplicative under the anti-bootstrapping rule. In this case, Plaintiffs seek compensatory or rescissory damages for the monetary losses caused by the alleged fraud, but seek only compensatory damages for the alleged breach of contract. At this stage, I am satisfied that the remedies

---

[92] *Catamaran Acquisition Corp. v. Spherion Corp.*, 2001 WL 755387, at *4 (Del. Super.) (noting that "the Court of Chancery would find it impossible to 'unscramble the eggs' by rescinding the Agreement").

[93] *See Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2020 WL 5587683, at *5 (Del. Super.) (suggesting that plaintiffs must plead for rescissory damages when distinguishing a fraudulent inducement charge from a contract damage); *see also Levy Fam.*, 2022 WL 245543, n.71 (noting that seeking rescissory damages is a remedy for dealing with breach of contract claims and fraudulent inducement claims) (citing *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *10 (Del. Super.)).

as pled are sufficiently distinct to avoid a pleading stage inference of bootstrapping.[94]

CoVenture argues that damages arising from the fraud and fraud in the inducement claims are different from damages arising out of the breach of contract claim.[95] The Stipulated Judgment ordered Sterling Risk, Burtonvic Capital, and several Burtonvic Capital Party Defendants to pay the principal amount with interest for their breach of contract.[96] CoVenture contends that it will have difficulty recovering expenses associated with execution on the Judgment. Coleman's actions allegedly impaired the Collateral to the Financing Agreement, making execution on the Judgment impractical or impossible.

Coleman argues that fraud damages sought by CoVenture are "part and parcel of alleged breaches of the Financing Agreement by one or more of the Contract Defendants."[97] Thus, the fraud and fraud in the inducement damages arise out of CoVenture's breach of contract damages and are duplicative.

This Court has held that the "goal of a damages award is just and full compensation, with the focus on plaintiff's injury or loss."[98] If the Stipulated

---

[94] *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *9 (Del. Ch.).
[95] Pl.'s Answering Br. in Opp. to Def.'s Mot. to Dismiss 9–12.
[96] Am. Stipulated J.
[97] Def.'s Opening Br. in Supp. of Mot. to Dismiss 11.
[98] *AFH Holding Advisory, LLC v. Emmaus Life Scis., Inc.*, 2013 WL 2149993, at *13 (Del. Super.).

25

Judgment results in full recovery for breach of contract, there is no possibility of obtaining from Coleman the same damages for fraud.

This Court is not persuaded by CoVenture's argument that the fraud and breach of contract damages are separate and distinct. The speculative difficulty, and any additional associated expenses incurred, in executing on the Judgment, do not constitute different damages.

CoVenture has not pled recission or rescissory damages for fraud in the inducement.[99] The contract and fraud claims are based on the same operative facts. CoVenture is not entitled to duplicative compensatory damages. Should CoVenture be successful in its fraud in the inducement claim, it is not entitled to double recovery, assuming full recovery for breach of contract.

## CONCLUSION

The Court finds that CoVenture's fraud claims (as distinguished from fraud in the inducement) are a "rehash" of CoVenture's breach of contract claim. CoVenture's tort claims for fraud cannot survive alongside the breach of contract claim.

The contract and fraud claims are based on the same operative facts. CoVenture is not entitled to duplicative compensatory damages. Should CoVenture

---

[99] Am. Compl. at ¶ B.

be successful in its fraud in the inducement claim, it is not entitled to double recovery, assuming full recovery for breach of contract.

**THEREFORE**, Defendant Joshua Coleman's Motion to Dismiss Plaintiff's Amended Complaint is hereby **GRANTED IN PART AND DENIED IN PART**. Fraud claims against Coleman in Count II are hereby **DISMISSED**. Fraud in the inducement claims against Defendant Coleman remain and are not subject to dismissal at this stage of the proceedings.

**IT IS SO ORDERED.**

_/s/ Mary M. Johnston_
The Honorable Mary M. Johnston